## H. Kannmacher v. The State.

### No. 3903.   Decided March 6, 1907.

**1.—Murder in First Degree—Misconduct of Jury—Motion for new Trial—Question of Fact.**

Where upon motion for new trial, after a conviction for murder, supported by the affidavit of defendant and one of the jurors, setting up misconduct of the jury and that the verdict had been reached by undue influence and argument in the jury room, which the defendant proposed to prove by the different members of the jury whom he had present in the court. Held, that the court erred in not permitting an inquiry into the manner of reaching the verdict upon the grounds : alleged; and this although the State controverted said motion by affidavit of one of the jurors.

**2.—Same—Statutes Construed—Controversy Should be Heard.**

Article 821, Code of Criminal Procedure, provides where the issue of misconduct of the jury is controverted by the State, the court may hear evidence by affidavit or otherwise; and where the attached affidavit to the motion for new trial showed that defendant's counsel were compelled to resort to the court to elicit the testimony of the several jurors with reference to their misconduct in reaching a verdict, the court should have heard such testimony, although one juror by affidavit denied such misconduct. Qualifying, Jack v. State, 20 Texas Crim. App., 656.

**3.—Same—Charge of Court—Malice a Fact.**

Upon trial for murder a charge on murder in the first degree should be complete within itself, and should contain the proper instruction on express malice.

**4.—Same—Cooling Time—Murder Second Degree.**

Wherever it is necessary to charge on cooling time, the court should define this term: however, where the evidence showed a continuous difficulty from beginning to end, the question of cooling time did not intervene.

**5.—Same—Sudden Transport of Passion—Charge of Court.**

It is not necessary that in order to reduce a murder from the first to the second degree that the homicide occur in a sudden transport of passion; if the mind of the slayer is not cool and deliberate when the intent is formed, but is laboring under any excitement or passion, this would reduce the homicide to murder in the second degree. See charge which places on defendant a greater burden than the law authorizes.

**6.—Same—Self-Defense—Breach of Peace.**

Where upon trial for murder there was evidence that defendant was in charge of the premises where the homicide occurred, and that he demanded of deceased to keep the peace and to preserve order, this phase of the case should have been submitted in connection with defendant's right of self-defense.

Appeal from the Criminal District Court of Dallas. Tried below before the Hon. E. B. Muse.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*A. W. Nowlen, Muse & Allen,* for appellant.—On question of hearing evidence on misconduct of jury: Riley v. State, 81 S. W. Rep., 711; Robbins v. State, 83 S. W. Rep., 690. On question of cooling time: Hayman v. State, 83 S. W. Rep., 205; Cooper v. State, 85 S. W. Rep., 1059; Jones v. State, 33 Texas Crim. Rep., 492. On question of self-defense: Palmer v. State, 83 S. W. Rep., 202.

*F. J. McCord,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death; and prosecutes this appeal.

A summary of the facts shows that the homicide occurred in the City of Dallas at Strong's saloon on the night of the 6th of September, 1905. Deceased, Will Rasberry, Bob Oliver, Zollie Meyer, and Highburger were engaged in a game of dominoes in a little room in the saloon at the south end of the bar counter. Appellant was bartender in the saloon, and one Zbiranski, who was called Chef, also connected with the saloon, was at the time in the domino room. The parties had been playing some time for beer, of which they appear to have drank freely. Somewhere about 10 o'clock a disturbance occurred in the domino room between the deceased (Rasberry) and Chef; Chef said something about the game and deceased took offense at it; got up with a beer bottle and cursed and abused Chef, and was in the act of assaulting him. At this juncture appellant, who was in charge of the bar as night tender, the proprietor being absent, came back to the domino room, as some of the witnesses say, with brass kuncks on his right hand, and demanded to know what was up, and told the parties to stop the disturbance. Deceased told him it was none of his

business, that he was not going to fight in the saloon but threatened to take Chef out in the alley and whip him; told appellant to go back to the bar; that his place was behind the bar; appellant said he would show him whether it was his business or not, and immediately went to the end of the bar and got a pistol and came back with the pistol presented in the door of the domino room; deceased in the meantime had advanced to the door with the beer bottle in his hand. The State's witnesses show he was doing nothing but standing there with a bottle in his hand. Appellant's witnesses show that he was advancing or in the act of advancing with the bottle in his hand. At this juncture appellant began firing. Deceased in the meantime got behind the door which had a glass panel in it, and appellant fired a second shot through the door, which struck deceased in the left breast below the collar bone, cut the main artery, which caused his death in a few minutes. The third shot was fired, which went into a window sill in the room, or it is possible the third shot is the one which killed deceased. It appears that prior to this homicide, the parties, appellant and deceased, were on friendly terms.

Appellant's first bill of exceptions brings in review the alleged misconduct of the jury. Said bill is somewhat lengthy, and we abbreviate it as follows: Appellant alleged in his motion for a new trial substantially, as follows: That while the jury were considering their verdict, five of said jurors were opposed to the infliction of the death penalty and refused to consent thereto; that the argument was used to said jurors by some member or members of the jury that the only way to stop homicides in Dallas County was to inflict the death penalty; that a large number of murders had been committed of late in Dallas County; that many men were being acquitted of murder, and that as a wholesome lesson for deterring the commission of crime, the death penalty should be inflicted; that among many other cases said jurors discussed the recent acquittal of R. R. Parker upon a charge of murder in the District Court of Dallas County as a miscarriage of justice. Appellant further alleged that in order to cover up and conceal said misconduct said jurors had entered into an agreement between themselves prior to returning a verdict that they would not talk with any person, or state to any person what occurred in the jury room in connection with their verdict unless compelled to do so by the court; that appellant's counsel had endeavored to converse with said jurors to determine how they reached their verdict, whether by corrupt means, in order to present same in his motion for a new trial, but had been informed by two of the jurors, to wit: Craig and Buchanan, that they had entered into an agreement not to tell how they reached their verdict, and refused to make any statement to appellant's counsel, to wit: J. C. Muse and R. B. Allen, in regard to any matter connected with their verdict, basing their refusal upon an agreement between the members of the jury; that they would only tell what occurred if compelled to do so by the court. Appellant attached to his motion for a new trial the affidavit of one A. W. May, which

shows substantially, as follows: That said May is a resident of the City and County of Dallas, and has been for a number of years, and is acquainted with the juror S. A. Murdock, who served on the jury in the trial of appellant; that a few days after the rendition of said verdict affiant met said juror Murdock in the City of Dallas, and after greeting him, said, "How did you come to hang that man Kannmacher,' 'to which Murdock replied, "That it was a coldblooded murder and that the jury thought it was time that these wholesale killings in Dallas County should be stopped." Affiant then asked him if Kannmacher had any provocation for the killing, and stated that he thought no sane man would have acted like Kannmacher did, to which Murdock replied, "I thought Kannmacher did act very queer myself, and I was not individually in favor of the death penalty, but the jury thought that wholesale killing in Dallas County should be stopped and that the death penalty should be inflicted in order to stop such killings." The juror further stated that it did not seem to him that defendant was all right mentally. The State introduced the controverting affidavit of the juror Murdock, which avers that he did not state to one A. W. May that himself and others were opposed to returning the death penalty, and that the argument was made that the death penalty was the only way of deterring homicides in Dallas County, and further that no such argument was made to affiant in retirement of the jury.

Motion for a new trial, which is made a part of the bill of exceptions, shows that appellant had all the members of the jury present and desired to interrogate them in the presence of the court, and proposed to show by them the agreement aforesaid, and that they discussed in connection with the verdict, and in the assessment of the death penalty, other killings in Dallas County, and the miscarriage of justice on account of such other killings. The court in explaining his action in striking out appellant's attack on the verdict of the jury, and in refusing to permit him to examine the jurors in regard thereto, explained as follows: "The court refused to permit the inquiry into the verdict upon the ground as alleged in the bill. The fact of the agreement among the jury was as alleged in the bill. As to what the defendant expected to prove by the jurors as to what occurred among the jury in deliberating upon the verdict, the court does not approve as a fact, but only as to what was expected to be proved and the sources of information as to such proof are disclosed in the bill as merely speculative based upon the affidavit of A. W. May, the agreement among the jury and the refusal of Craig and Buchanan to affirm or deny as stated in the bill." We gather from this bill of exceptions that the contention of the State is that appellant, by his proceedings, did not make an issue as to the misconduct of the jury; that in order to raise this issue it is incumbent on appellant to allege some fact and support it by affidavit or otherwise, before the court will be justified in interrogating the jury on the subject; that the most that can be said of this proceeding is that appellant is informed and believes, and he only supports this informa-

tion by the affidavit of May, which in itself is nullified by the affidavit of Murdock. In support of this contention, appellant refers us to Jack v. State, 20 Texas Crim. App., 656. It appears that was a trial of one Jeff Jack on a charge of theft of personal property, and the proof showed that he was porter of the party from whom he was alleged to have committed the theft. During the trial a member of the jury, in the presence of some of the other members, stated that he had once been robbed by a porter. The court held that this was not such misconduct as would authorize a new trial, and intimates that this accusation against the jury was not sufficient to require jurors to testify as to such misconduct, and the opinion goes on to say: "While under our statute it is competent to prove misconduct by the voluntary affidavit of a juror, the statute does not intimate that jurors can be brought into court by process and compelled to go upon the witness stand and testify as to arguments used and opinions expressed and given by jurors in the jury room." It may have been the practice formerly, when an attack was made on the integrity of a jury's verdict, not to require testimony of jurors as to what occurred in the jury room, but that is no longer the rule. The statute itself seems to authorize such a proceeding. It reads as follows: "A new trial will be granted where, from the misconduct of the jury, the court is of the opinion that the defendant has not received a fair and impartial trial, and it shall be competent to prove such misconduct by the voluntary affidavit of a juror and the verdict may in like manner, and such cases be sustained by affidavits." Evidently if the verdict can be impeached by the voluntary affidavit of a juror it could be equally impeached when the ground is laid for this impeachment by requiring the jurors to be sworn and testify in regard to the verdict, and this seems to have been the practice before the decision in the Jack case, and we do not understand that decision to go further than to hold that there must be a real ground of misconduct stated and brought to the attention of the court by motion or otherwise. In such case, in the investigation of the question, the court will not be confined to the voluntary affidavits of jurors, but will compel them to testify. For a discussion of this question, see Mitchell v. State, 36 Texas Crim. Rep., 278; Ysaguirre v. State, 2 Texas Ct. Rep., 97; 42 Texas Crim. Rep., 253; Long v. State, 13 Texas Ct. Rep., 559, and Covington v. State, decided at present term. In the latter case this court held a motion impeaching the verdict of the jury for misconduct would be considered though filed after the expiration of two days. Article 821, Code Criminal Procedure, provides where the issue of misconduct is controverted by the State, the court may hear evidence by affidavit or otherwise. Of course, it is incumbent in the first instance, on the party attacking the verdict to do so by the allegation of some fact supported by affidavits which questions the integrity of the verdict and tends to show some misconduct of the jury in arriving at the verdict. The question here presented is: Did the affidavit made by appellant and supported by May make an issue as to

the misconduct of the jury in connection with the other facts and circumstances presented in the bill of exceptions? This affidavit of appellant, in his motion for a new trial, shows that his counsel had endeavored to talk with the jurors in regard to their verdict, but the jurors had refused to talk with or discuss the subject of the verdict with counsel unless they were compelled to do so by the court. They had already procured the affidavit of May, which states substantially that the juror Murdock had told him that he was not originally in favor of the death penalty, but that the jury thought that wholesale killings in Dallas County should be stopped, and that the death penalty should be inflicted in order to stop such killings. Evidently the State believed that this affidavit was calculated to throw suspicion on the verdict of the jury as it procured the affidavit of the juror Murdock who denied the allegations contained in May's affidavit. If the matter had been left here, the court might have been authorized to decide that the last affidavit was true, and to have overruled the motion for a new trial predicated on this ground, but when appellant informed the court that the jurors had refused to talk with him or his counsel on the subject, and had told him as a reason why, that they had entered into an agreement not to do so, and when appellant craved of the court permission to have said jurors sworn in order to investigate the matter, it occurs to us it was the plain duty of the court to have granted this permission. Appellant did more than state his suspicions as to how the verdict was reached; he supported this with the affidavit of one witness May, and then explained to the court why it was impossible for him to produce any affidavit of any juror as they had refused, on account of an agreement among themselves, to talk to him on the subject. Appellant showed that he had done all as to this matter which it was possible for him to do, and though of itself the affidavit of May may not have been sufficient to overturn the verdict and show it was superinduced by misconduct, it was sufficient to cast suspicion upon the verdict, and in our opinion the court should have had the accusation against the jurors throughly investigated. It may be there was no misconduct or undue means calculated to influence the verdict of the jury. We are left in the dark as to that, from the fact that the court refused to hear the testimony, and so long as under our laws and constitution a defendant is entitled to a fair and impartial trial by jury, we cannot permit a verdict to stand which is under the shadow of suspicion as to its fairness. If there was no misconduct, the State had nothing to fear from an investigation of the jury, and the very fact that the investigation was refused tends to create an apprehension, that there may have been some misconduct calculated to impeach the verdict, and that it may not have been altogether fair and impartial. We are the more constrained to this view, because the homicide in this case was the result of no previous grudge or ill-will between the parties, but occurred in a sudden quarrel, and if there was that express malice aforethought which alone justifies a conviction of

murder in the first degree, it was formed within a very brief space of time. While the law limits the formation of this express malice aforethought to no particular time, still when the circumstances show a killing on a sudden quarrel, with no element of previous ill-will, it will not be permitted that the verdict shall rest under any suspicion of unfairness. All that appellant asked was that the light be turend on, and that he be permitted to question the jury as to any misconduct which may have occurred in reaching the result. This privilege was refused to him.

The charge of the court is criticised in several respects. It is insisted that nowhere in the charge on murder in the first degree is the jury told that express malice is a fact that must be proved; that the use of this language in the charge on murder in the second degree is not sufficient. While we are not inclined to view this as error, certainly not as reversible error, still on another trial, we suggest that the charge on murder in the first degree be complete in itself.

It is also insisted that the charge on murder in the second degree is not complete in that it fails to define cooling time as between murder in the first and second degrees; that is, it is claimed there was an interval between the first altercation and the fatal shooting, and while the court told the jury that if the intent was formed in a mind disturbed by passion and cooling time had not elapsed between the intent formed and the execution of the design, that the homicide would be of no greater magnitude than murder in the second degree, it is urged that the court should have further defined cooling time; that is, such time as the mind of a person of ordinary temper would under the circumstances become calm, etc. Wherever it is necessary to charge on cooling time, we believe the court should define what cooling time is. However, it occurs to us that this was a continuous difficulty from beginning to end. After the altercation began appellant took a few steps, two or three, and secured his pistol and immediately returned and began shooting. It would seem from this that the question of cooling time did not intervene. So that, if the intent was formed when appellant first went in front of the domino room and his mind was then calm and sedate and he formed the intent at that time, and he consummated the design immediately as testified to, there was no question of cooling time, or if he formed the intent to kill subsequently when he went in front of the domino room with his pistol in his hand, and his mind was cool and deliberate at that time, it would be murder in the first degree. However, if on the other hand his intent was formed when his mind was not calm and deliberate, but under a state of excitement, it would not be murder in the first degree but murder in the second degree, or manslaughter, as the case may be.

Appellant also complains because the court in charging on murder in the second degree required the jury to believe that appellant shot deceased in a *sudden transport* of passion. We agree to this contention. This is an undue limitation and restriction on murder in the

second degree, and is calculated to cause a conviction of murder in the first degree. It is not necessary that in order to reduce a murder from the first to the second degree that the homicide occur in a sudden transport of passion. A passion is not required either to be sudden nor is it necessary that there be a transport of passion. If the mind of the slayer is not cool and deliberate when the intent is formed, but is laboring under any excitement or passion, this would reduce the homicide to the second degree. See Gaines v. State, 53 S. W. Rep., 623; Thomas v. State, 74 S. W. Rep., 36, and Boyd v. State, 28 Texas Crim. App., 137. In the last named case Judge Willson lays down in a condensed form an apt presentation of the law of murder upon implied malice, and this is peculiarly applicable where there is no charge given on manslaughter. The same vice occurs in the court's charge on manslaughter; that is, the court requires the intent to kill to be formed in "a sudden transport of passion" on adequate cause. This is not the law, but if the mind is excited and not capable of cool reflection from some adequate cause, it is none the less manslaughter, notwithstanding the passion may not be a transport of passion. This character of vice often occurs in charges, no doubt superinduced by the fact that the printed charges used by the judges contain this error, and we have had occasion more than once to reverse cases on this account, and we again call attention to the incorrectness of this character of charge, and in any case where it is given and calculated to work injury, it will operate a reversal. In this particular case, we cannot say that it did not operate to the prejudice of the appellant; he was convicted of murder in the first degree, and in applying the law to the facts, the jury were instructed that they were only authorized to convict appellant of murder in the second degree if the intent to kill was formed in a "sudden transport of passion." It may be that appellant's mind was excited by passion and the jury might have believed under a proper charge that it was so influenced, while at the same time they might not have believed that he was laboring under a sudden transport of passion. This was placing on appellant a greater burden than the law authorizes.

Some criticism is indulged in by appellant of the court's charge on the failure to instruct the jury with reference to appellant's right to preserve good order and prevent a breach of the peace in the house under his control. We believe on another trial of the case, the attention of the jury should be properly directed to this phase of the case. Of course, no right of property was involved, as we take it, in connection with the right of self-defense, but inasmuch as the testimony tended to show appellant was in charge of the premises, he had a right to preserve order in the house, and to prevent a breach of the peace, and to use such force as was necessary for that purpose, but no more. If in preserving the peace deceased made an assault on appellant, which threatened his life or his person with serious bodily injury, he was authorized to defend himself. If on the other hand appellant com-

manded the peace, and deceased did not recognize his authority, but was doing no act which put appellant's life in danger or his person in danger of serious bodily injury, and appellant shot and killed him, he would be guilty of either murder or manslaughter, as the facts of the case might authorize.

We do not deem it necessary to discuss other assignments. For the errors pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*