**Willie Clarence STEPHENSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 45707.**

Court of Criminal Appeals of Texas.

May 23, 1973.

Rehearing Denied June 13, 1973.

Don Stokes, Marshall, for appellant.

Jim D. Vollers, State's Atty., and Robert A. Huttash, Asst. State's Atty., Austin, for the State.

## OPINION

ODOM, Judge.

This appeal is from a conviction for the offense of rape; punishment was assessed at death.

The sufficiency of the evidence is not challenged; therefore a detailed recitation of the facts is not necessary. The relevant facts will be discussed as they apply to the various ten grounds of error. Suffice it to say that the prosecutrix testified that on February 15, 1971, she and her husband were awakened by appellant in a trailer park where they were staying. She stated that appellant raped her while holding a pistol in one hand and a shotgun in the other. Her husband was forced to remain on the floor beside the bed with his head on a chicken crate during the assault. The prosecutrix identified appellant as her assailant, both at a lineup and at trial. Certain items of clothing obtained from appellant's house were introduced in evidence. Lint from the clothing was compared with lint from the blankets on the prosecutrix' bed and was found to be "visually and chemically alike." Also introduced was a piece of paper which the prosecutrix testified fell from her assailant's pocket. A handwriting expert testified that the writing on the paper matched the handwriting of appellant's half-brother, whom a state witness testified the appellant had visited in the Harrison County Jail. An inmate of the jail testified that he had witnessed a note being passed between appellant and his half-brother. The pistol and shotgun allegedly used by appellant were never found.

Initially, appellant contends that the trial court erred in admitting evidence obtained as the result of an illegal search and seizure. The state relies upon consent to search given by appellant's mother.

The record reflects that appellant lived at home with his mother. He does not challenge the mother's right to consent; he argues, however, that her consent is invalid in that it was coerced under color of law. His argument is based on the fact that the officer admitted that he told the mother that if she did not sign the consent-to-search form, he could get a search warrant to search the house.

■■ It is well established that an individual may waive the protections afforded by the Fourth Amendment against unreasonable searches and seizures by consenting to a search. E.g., Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576 (1967); Allen v. State, Tex.Cr. App., 487 S.W.2d 120; Paprskar v. State, Tex.Cr.App., 484 S.W.2d 731; DeVoyle v. State, Tex.Cr.App., 471 S.W.2d 77. Equally well established is that the burden is upon the prosecution to show that the consent was freely and voluntarily given. Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The burden requires that the prosecution show that the consent was positive and unequivocal, and there must not be duress or coercion, actual or implied. Allen v. State, supra.

■ In determining whether a search is justified by the consent of a person who has a right to the possession and control of the property, this court looks to the totality of the circumstances surrounding the questioned conduct. Cf. Paprskar v. State, supra. The facts and circumstances attendant to the search of appellant's home were developed in the hearing that was had on appellant's motion to suppress.

Officer Stanfield testified that he went to the door of appellant's home around 5:00 P.M. on February 16, 1971, and there met Mrs. Stephenson, appellant's mother. He identified himself and told her that he was looking for a black suit and that her son was a suspect in a rape case. He testified that he read a consent form to her and that the blanks on the form were filled in before he got to the house. According to the officer's testimony, Mrs. Stephenson, after reading the consent-to-search form, signed it, went to a closet in the house, got

appellant's clothes and gave them to the officer. The consent-to-search form was introduced into evidence. It states:

"I, Virginia Stephenson, have been informed of my constitutional rights not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, (sic) hereby authorize S. J. Stanfield and I. W. Hays to conduct a complete search of my residence located at 1507 Harrison.

These agents are auth_rized (sic) by me to take from my residence 1 Black suit & Gold Shirt which they may desire (sic).

This written permission is being given by me to the above name (sic) agents voluntarily and without threats or promises of any kind.

Signed: x Virginia Stephens (sic)

Witnesses: Sgt. I. W. Hays          "[1]

Mrs. Stephenson's testimony regarding the circumstances of the search sharply conflicts with that of Officer Stanfield.[2] Undisputed, however, is the fact that the officer was polite in behavior; that only two officers entered the house, one wearing a uniform and the other dressed in plain clothes; that no physical coercion was exercised; that she was handed the consent-to-search form; and, that she signed the form.

■■ Although a finding of consent is not simply a finding of fact and includes also a finding of law, (Hoover v. Beto, 439 F.2d 913 [5 Cir. 1971]), a conflict in testimony is best resolved by the trier of the facts who has the benefit of viewing the demeanor of the witnesses. It was the trial judge's prerogative at the motion to suppress to believe the officer's version of the facts and disbelieve the mother's.[3]

On cross-examination Mrs. Stephenson testified that she went through the tenth grade in school and that she could read and write. She read aloud the consent-to-search form in court. She stated that she had no objection to the search because she did not want the officers to think that she had anything to hide.

■■ There is no doubt that a search cannot be justified as lawful on the basis of consent where that "consent" has been given only after the official conducting the search has asserted that he possesses a warrant. Bumper v. North Carolina, supra. However, we refuse to hold, as a matter of law, that an assertion by the officer conducting the search that he could or would obtain a search warrant if consent is refused, standing alone, invalidates an otherwise voluntary consent.[4] Instead, we hold that the assertion is but one fac-

---

1. Sgt. Hays, whose name appears on the form as a witness, did not testify.

2. Mrs. Stephenson testified that the officer searched the house and found her son's clothing before showing her the consent-to-search form. She stated that although she signed the form, she did not read it nor did the officer read it to her. She stated that she was extremely nervous and that was the reason she misspelled her name when she signed the form. She said she signed the form because the officer told her to sign it and that she believed that you are supposed to do what the "law tells you to do."

3. Virtually the same testimony concerning the search was placed before the jury, and

they were instructed that "if you find from the evidence that . . . (the officer) did not have a proper search warrant or the knowledgeable waiver of Mrs. Virginia Stephenson to make a search . . . you will disregard any evidence . . . found on said premises . . . "

4. For federal cases holding that a consent to search is voluntary even though the officer suggested to the suspect that a warrant could be obtained, see United States ex rel. Gockley v. Myers, 378 F.2d 398 (3d Cir. 1967); Hamilton v. North Carolina, 260 F.Supp. 632 (E.D.N.C.1966); and Kershner v. Boles, 212 F.Supp. 9 (W.Va.1963).

tor, albeit an important one, to be evaluated realistically, within the context it was uttered and in relation to all the facts surrounding the search.

With this approach, we find no indication in the record that, but for the assertion by the officer, the mother would not have consented to the search. To the contrary, the record supports the conclusion that this statement played little or no part in her decision to voluntarily retrieve the items the officers sought. Mrs. Stephenson did not mention the officer's assertion in her rendition of the facts, and when asked the question, "Would you have refused the search had you known you had the right to?" she answered, "I don't know—according to the circumstances, I really don't know what I would have done, I am just going to tell the truth, I don't know."

Viewing the evidence from the standpoint most favorable to the court's ruling, we conclude that the consent was valid. Further, since the mother voluntarily retrieved the items sought by the officers, there was in fact no search as contemplated by the Fourth Amendment. Collidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564; Sorensen v. State, Tex.Cr.App., 478 S.W.2d 532.

By his second and third grounds of error appellant complains of the action of the trial court in overruling his motion for attachments to issue against 71 absent, prospective jurors and his motion to quash the entire venire.

A copy of the venire, containing the names of 150 veniremen, was served on appellant. However, when empaneling the venire, the District Clerk called out the names of but 79 persons of which only 62 responded as present. Appellant requested that the 71 veniremen whose names were not called by the clerk be attached. His request was denied. He then filed a motion to quash the entire venire on the grounds that (a) the trial court had refused to issue the attachments and (b) that the 71 veniremen were improperly excused.

Article 35.07, Vernon's Ann.C.C.P., sets out the procedure for a challenge to the array:

"Each party may challenge the array only on the ground that the officer summoning the jury has wilfully summoned jurors with a view to securing a conviction or an acquittal. *All such challenges must be in writing setting forth distinctly the grounds of such challenge. When made by the defendant, it must be supported by his affidavit or the affidavit of any credible person.* When such challenge is made, the judge shall hear evidence and decide without delay whether or not the challenge shall be sustained." (Emphasis added)

Appellant's challenge to the array was not supported by affidavits as required by Article 35.07, V.A.C.C.P. and therefore presents nothing for review. Gonzalez v. State, Tex.Cr.App., 468 S.W.2d 85; Donald v. State, Tex.Cr.App., 453 S.W.2d 825.

Appellant relies upon Article 35.01, V.A.C.C.P., for support of his contention that the trial court reversibly erred by refusing his motion for attachments.

Article 35.01, supra, provides:

"When a case is called for trial and the parties have announced ready for trial, the names of those summoned as jurors in the case shall be called. Those not present may be fined not exceeding fifty dollars. An attachment may issue on request of either party for any absent summoned juror, to have him brought forthwith before the court. A person who is summoned but not present, may upon an appearance, before the jury is qualified, be tried as to his qualifications and impaneled as a juror unless challenged, but

no cause shall be unreasonably delayed on account of his absence."

Recently, in Brown v. State, Tex.Cr. App., 475 S.W.2d 938, this court stated:

"Appellant relies upon Article 35.01, V. A.C.C.P., to support his claim that the court erred in refusing his motion for attachments to issue against absent prospective jurors who had been summoned and not properly excused from jury duty. The statute is directory, not mandatory, and any failure of the court to observe a literal compliance will not constitute reversible error in the absence of a showing of injury."

Appellant asserts that injury is shown because, after exhausting his peremptory challenges, he was forced to take an "objectionable" juror. An objectionable juror, in the sense in which the term is used in this connection, "means one against whom such cause for challenge exists as

would likely affect his competency or his impartiality in the trial." Hudson v. State, 28 Tex.App. 323, 13 S.W. 388, 389. Without some such showing, it is idle simply to say that a juror is objectionable. The record reflects that the prospective juror complained of, Marshall Page, in response to appellant's question whether he could serve as a fair and impartial juror, answered "No, I don't believe I could." However, on redirect examination by the prosecutor he stated that he could be a fair and impartial juror and that he had misunderstood Mr. Stokes' (defense counsel) question. The record reflects that the trial court allowed appellant additional peremptory challenges which he exhausted. It also reflects that the jury was selected from those prospective jurors that were present and that it was not necessary to summon additional talismen. Under the particular facts of this case, we do not agree that the juror was objectionable or that appellant was unduly harmed by the procedure here utilized.[5]

---

5. Had appellant's challenge to the array been properly presented to the trial court, a different result most probably would be reached. It was established at the hearing on the motion for new trial that the 71 absent prospective jurors were excused for various reasons by the sheriff. The district clerk testified that at the time of empaneling the jury on July 12, 1971, there appeared 150 names on the list but many names had been "scratched off." He testified that he gets his "strike-off" list from the sheriff after his attempted notification of the persons drawn from the jury wheel. Asked for what reasons the names were scratched he responded that "some of them are deceased, and a number of them moved out of the county, moved out of the state altogether . . . there's a lot over-age . . . there are some I think had minor children involved," but stated that he did not keep a record of how many were returned unserved or how many were excused. It was stipulated that no sworn affidavits were filed by any veniremen in support of being excused from the jury panel as Article 35.-04, V.A.C.C.P., requires. Jim Newman, one of the prospective jurors, testified that he was summoned to appear for jury duty but that he did not appear because "the

commissioner got me off." He stated that he was excused because the County Road and Bridge Department, for whom he worked, was shorthanded. He stated that he did not file an affidavit with the Clerk of the Court, but mailed a "card" to the clerk which his wife filled out. Article 33.09, V.A.C.C.P., provides:

"Jury panels, including special venires, for the trial of criminal cases shall be selected and summoned (with return on summons) in the same manner as the selection of panels for the trial of civil cases except as otherwise provided in this Code."

In Texas & New Orleans Railroad Company v. Jacks, Tex.Civ.App., 306 S.W.2d 790, it was stated:

"It is clear from the holding in Ulmer v. Mackey, 242 S.W.2d 679 (Tex.Civ.App., 1951) and from the statutes regulating the selection of persons for jury service, that the district clerk and sheriff are without lawful authority to excuse jurors." at 793.

Article 35.04, V.A.C.C.P., reads:

"Any person summoned as a juror who is exempt by law from jury service may establish his exemption without appearing in person by filing a signed statement of the ground of his exemption

■ By his fifth ground of error, appellant contends that the trial court erred in overruling his motion for mistrial after a police officer volunteered information which indicated that appellant was a criminal generally. The complaint arose in the following context. It had been established that appellant's mother signed a consent-to-search form spelling her name *S-t-e-p-h-e-n-s*. During appellant's cross-examination of Officer Stanfield the following occurred:

"Q. (By Mr. Stokes) She couldn't even sign her own name, could she?

MR. BAXTER: Objection, your Honor! Officer Stanfield knows how defendant's mother spells her name, I'm not sure he is qualified to answer that question.

THE COURT: Objection is overruled.

Q. You prepared the rest of this, (consent-to-search form) didn't you?

A. Yes, sir.

Q. How did you spell her name up here at the top?

A. S-t-e-p-h-e-n-s-o-n, the same way Willie spells his name.

Q. Right. S-t-e-p-h-e-n-s-o-n, so you do know how her name is spelled, don't you?

A. Yes, sir, S-t-e-p-h-e-n-s-o-n.

Q. That's not the way she signed it?

A. That's the way Willie used to go by, he changed it.

Q. Oh, I see.

A. All our records used to show the same way his mother's is, even on the fingerprint cards were that way."

Appellant argues that the unresponsive or volunteered answer concerning fingerprint cards conveyed to the jury that he was a criminal generally. In Vessels v. State, Tex.Civ.App., 432 S.W.2d 108 (1968) this court noted that fingerprints are a means of identification and proof that one has an established fingerprint record is not proof that he is a criminal or that he has previously been convicted of a crime. Accord, Bundren v. State, 152 Tex.Cr.R. 45, 211 S.W.2d 197.

■ Appellant alleges in his sixth ground of error that he was denied a fair trial before an impartial jury because the sheriff, who was acting as bailiff, allowed certain deputies to fraternize with the jury in the sheriff's office by allowing them to "drink coffee and doughnuts in that office."

In Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424, two deputy sheriffs served dual roles as prosecution witnesses and jury custodians. During the three-day trial, the jury was sequestered and was in "close and continual association" with the deputies. The United States Supreme Court held that the prejudice inherent in that situation violated Turner's due process right to a fair trial before an impartial jury. And in Gonzales v. Beto, 405 U.S. 1052, 92 S.Ct. 1503, 31 L.Ed.2d 787, the Supreme Court held that where the sheriff played a dual role as the key prosecution witness and as the bailiff of

with the clerk of the court at any time before the date upon which he is summoned to appear."

Although it was not alleged that the sheriff in the instant case "wilfully summoned jurors with a view to securing a conviction or an acquittal," (Article 35.07, supra) a practice which at least ostensibly allows county officials, and law enforcement officers to arbitrarily grant exemptions, without the trial court's knowledge, is certainly not condoned by this court.

the jury, the defendant's due process right to a fair trial was violated.

In the present case, the sheriff, who was acting as bailiff under the authority of Article 36.24, V.A.C.C.P., was not a witness in the case. Further, there is no support in the record for the assertion that his deputies ever talked with or were ever in close and continual association with the jury.

In Gonzales v. Beto, supra, the Supreme Court analyzed the application of the *Turner* decision thusly:

"Turner, of course, did not set down a rigid, *per se* rule automatically requiring the reversal of any conviction whenever any Government witness comes into any contact with the jury. The Court's opinion specifically indicated that association with the jury by a witness whose testimony was 'confined to some uncontroverted or merely formal aspect of the case for the prosecution' would hardly present a constitutional problem. Id., at 473 of 379 U.S., 85 S.Ct. 546. And it indicated that a mere 'brief encounter,' by chance, with the jury would not generally contravene due process principles.

\*   \*   \*   \*   \*   \*

"But the Court in *Turner* was not dealing with just any prosecution witness coming into any contact with the jury. Rather, it was dealing with crucial witnesses against the defendant who associated with the jurors as their official guardians throughout the trial. Turner

established the simple principle that association of that particular sort cannot be permitted if criminal defendants are to be afforded due process of law." 92 S. Ct. at 1505.

In the case at bar, the record does not reflect that a "crucial" or, for that matter, any witness was in contact with a member of the jury.

Appellant contends, in his eighth ground of error, that the trial court erred in refusing to allow him to take testimony from three jurors regarding jury misconduct.

The record shows that in his amended motion for new trial appellant's counsel stated that three jurors told him of certain actions which took place during deliberations that constituted misconduct.[6] It was further stated in the motion that the three jurors each advised counsel that they did not want to sign affidavits because they were afraid of getting involved, but would testify at the hearing on the amended motion for new trial. The jurors were subpoenaed by appellant for the hearing and were present in the courtroom. However, the trial court, relying on the general rule that a motion for new trial alleging jury misconduct must be supported by the affidavit of a juror or some other person who was in a position to know the facts,[7] refused to allow the subpoenaed jurors to testify.

█ The policy of this general rule is to discourage "fishing expeditions" in an effort to impeach a jury verdict. Its application should be one of reason. In

6. It was alleged in the amended motion for new trial that juror "Essie L. Smith advised defendant's attorney that after the jury retired to deliberate punishment, the foreman, Glenn E. Kempf, told the jury that if they did not give the defendant the death penalty and gave him life, that the defendant would get out of prison in a few weeks or months." It was also alleged that juror Lanell Morrow likewise so advised the attorney. The motion further alleged that a third

juror, Craver Green, told appellant's attorney that he told the other members of the jury that he knew that appellant would get a new trial on appeal and be out of jail in a few days anyway. The juror stated that he voted for the death penalty in order not to have to stay in deliberation any longer, knowing full well the appellant would get a new trial.

7. See, e. g., Walker v. State, Tex.Cr.App., 440 S.W.2d 653.

Moore v. State, 160 Tex.Cr.R. 642, 275 S. W.2d 673, this court quoted the following from Prince v. State, 158 Tex.Cr.R. 320, 254 S.W.2d 1006, 1011:

". . . Where the misconduct was of such a nature that it would be known only by members of the jury, *then* an affidavit of a juror is proper. But this is not the exclusive method. Where the appellant is unable to secure such an affidavit, it is incumbent upon him to show this, and why, and, further, to show reasonable grounds for believing that such misconduct actually occurred. For illustration, this might be done by an affidavit of some person, reciting that a member of the jury had told them of misconduct, followed by affidavit of appellant or in his behalf to the effect that, though requested to do so, such juror had refused to make an affidavit thereto. This also might be done by any other method that would put the trial court on notice that misconduct had occurred."

And in Clark v. State, 163 Tex.Cr.R. 54, 289 S.W.2d 288, this court again discussed the application of the rule requiring an affidavit:

"In matters of alleged jury misconduct, especially that which is alleged to have occurred within the jury room, this Court has required something more than a mere allegation thereof in order to circumvent 'fishing expeditions.'

"From time to time we have pointed out the advisability of an affidavit of a member of the jury attesting the facts relied upon to show misconduct. We have held, however, that such an affidavit is not absolutely necessary but that the failure to secure it might satisfactorily be explained or accounted for, in which event it would be the duty of the trial court to hear evidence in support of the allegations. (Citations omitted.)"

■ In the instant case, appellant complains of jury misconduct that occurred in the jury room during deliberations. In his motion for new trial, counsel for appellant specified by name the three jurors who had related the misconduct to him and explained that they refused to sign affidavits although they assured him they would testify to the facts alleged if subpoenaed. The following affidavit was attached to the motion:

"BEFORE ME, the undersigned authority, on this day personally appeared Don Stokes, Attorney for Defendant, affiant, who being duly sworn, on his oath deposes and says that the statements contained herein with reference to jury misconduct are true and correct."

We therefore conclude that the trial court was in error in refusing to allow the testimony of the three jurors. The appellant has brought himself within the rule authorizing introduction of the testimony of the jurors upon the hearing of the motion for new trial. Clark v. State, supra; Moore v. State, supra; Prince v. State, supra; Vyvial v. State, 111 Tex.Cr.R. 111, 10 S.W.2d 83; Kannmacher v. State, 51 Tex. Cr.R. 118, 101 S.W. 238; Heffnarn v. State, 97 Tex.Cr.R. 127, 260 S.W. 198.

Although the trial court erred by not allowing the jurors to testify, such is not reversible error. In both Clark v. State, supra, and Moore v. State, supra, other testimony concerning the jury's misconduct was heard although the jurors were not allowed to testify. In the instant case, no other testimony was offered or heard. We have only before us appellant's amended motion for new trial in which jury misconduct is alleged and the attorney's affidavit that the allegations are true. Appellant's attorney did not testify at the hearing on the motion nor did he proffer by means of a bill of exception what the jurors' testimony would be.

■ An affidavit attached to the motion is but a pleading that authorizes the introduction of supporting evidence. It is not evidence in itself; and in order to constitute evidence it needs to be introduced

as such at the hearing on the motion, which was not done in this case. Walker v. State, Tex.Cr.App., 440 S.W.2d 653; Davis v. State, Tex.Cr.App., 419 S.W.2d 648; Shelton v. State, 155 Tex.Cr.R. 187, 233 S.W.2d 148. See also, Art. 40.06, V.A.C.C.P.

The fourth contention complains of *Witherspoon*[8] errors, in the selection of the jury. Such is now moot since the death penalty that was assessed has been commuted to a life sentence. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797; Ex Parte Powers, Tex.Cr.App., 487 S.W.2d 101.

The seventh ground of error asserts that the death penalty is cruel and unusual punishment. This question is also moot. The death sentence was commuted to a life sentence. Johnson v. State, Tex.Cr.App., 489 S.W.2d 611.

Appellant's ninth contention is that the commutation denies him (1) the right of a jury determination of the sentence, (2) the right of trial by jury under the Seventh Amendment, and (3) denies him due process under the Fourteenth Amendment. Such has been decided against him in Whan v. State, 485 S.W.2d 275, cert. denied, — U.S. —, 93 S.Ct. 1906, 36 L.Ed.2d 394. See also, Stanley v. State, Tex.Cr.App., 490 S.W.2d 828.

In his last ground of error appellant contends the attempted commutation by Governor Preston Smith on January 4, 1973, is invalid since it commutes a conviction dated July 14, 1971, whereas the record reflects that the jury's verdict as to guilt and as to punishment was not returned until July 16, 1971.

The judgment filed July 23, 1971, is incorrectly dated July *14*, 1971. The judgment should be reformed to read July *16*, 1971, and it is so ordered. A new proclamation, issued by Governor Dolph Briscoe

on April 10, 1973, which commutes the death sentence assessed in appellant's conviction dated July 16, 1971, to life imprisonment, is valid.

The judgment, as reformed, is affirmed.

---

8. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).