**Tommy Ray JACKSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69434.**

Court of Criminal Appeals of Texas,
En Banc.

Feb. 3, 1988.

---

Walter C. Prentice, court appointed on appeal, Austin, for appellant.

Ken Anderson, Dist. Atty., Paul Womack, Asst. Dist. Atty., Georgetown, Robert Huttash, State's Atty., Austin, for State.

## OPINION

DUNCAN, Judge.

The appellant, Tommy Ray Jackson, was convicted of capital murder, V.T.C.A. Penal Code, § 19.03(a)(2).[1] Thereafter, the jury made affirmative findings to the special issues required by Art. 37.071(b)(1) and (2), V.A.C.C.P., and accordingly punishment was assessed by the trial court at death. Appellant's cause is now before us on direct appeal pursuant to Art. 4.04, § 2, V.A. C.C.P.

At the outset we are confronted with the threshold question as to the legality of the warrantless stop and ultimate search and seizure of the appellant and the automobile which he was driving through the streets of Austin, when it was detained by William Pruitt, of the Texas Department of Public Safety, and Dunny Donovan an officer with the Austin Police Department. The appellant contends that the arrest and search of his person and search of the vehicle was in contravention of the Fourth and Fourteenth Amendments to the United States Constitution.[2]

---

1. Omitting its formal parts, paragraph one of the indictment of which appellant was convicted alleged:

> ... did and there intentionally cause the death of an individual, Rosalind Robison, by shooting her with a gun; and the said defendant did then and there intentionally cause the death of the said Rosalind Robison in the course of committing and attempting to commit robbery of the said Rosalind Robison[.]

2. In his brief for the first time appellant asserts that his arrest and search of his person and vehicle was also violative of Article 14.04, V.A.C. C.P., which states:

> Where it is shown by satisfactory proof to a peace officer, upon representation of a credible person, that a felony has been committed,

and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without a warrant, pursue and arrest the accused.

The appellant argues that the record in his cause does not reveal that the peace officers were "... acting upon satisfactory proof from representations by a credible person that the appellant was about to escape, nor was there anything visible to the officer to indicate that there was no time to procure an arrest warrant." At no time, however, did the appellant assert Art. 14.04, supra, in the trial court, as a ground to suppress any of the seized items which were introduced into evidence at the trial of this cause. Thus, as to Article 14.04, supra, nothing was preserved for review. See *Nelson v. State*, 607 S.W.2d 554, 555 (Tex.Cr.App.1980).

We will now as concisely as possible identify the facts and circumstances that the State relied upon to show that probable cause existed to arrest and search the appellant's person and the motor vehicle he occupied at the time he was stopped.

The deceased, Rosalind Robison, was a student at the University of Texas at Austin, and resided with her roommate, Maria Salazar, in an apartment located in the vicinity of the University. On Thursday, November 17, 1983, at approximately 10:00 p.m., the deceased informed Ms. Salazar that she was going to the Petroleum Engineering Building at the University to pick up some study notes from James Dupree, a teaching assistant in the Engineering Department. After the deceased phoned Dupree to confirm that he was still in his office, she proceeded to the University. According to Dupree's testimony, she met with him, retrieved the notes, and between midnight and 1:00 a.m. left the Petroleum Engineering Building through the front exit. Salazar testified she believed her roommate would return to the apartment within an hour of her departure, and when she did not Salazar stayed up until 4:00 a.m. maintaining a vigil out of concern for Robison, at which time she retired. When Salazar woke-up at 7:00 a.m. she discovered that Robison still had not returned. Later that morning she attempted to find the deceased at some of her morning classes and when that failed, Salazar contacted Dupree who informed her he did not know her (the deceased's) whereabouts, although he had seen her the previous evening at the Petroleum Engineering Building.

Suspecting that something was wrong, Salazar contacted an officer with the Missing Persons Section of the Austin Police Department and filed a missing persons report on Rosalind Robison. William Rice an officer assigned to the Missing Persons Section revealed that although the original report was received by a patrol officer on the 18th of November it came to his attention on the morning of the 19th. The report noted that Rosalind Robison, a white

female, twenty-four years of age, was last seen at approximately 10:00 p.m. on the 17th of November, 1983, and was driving her vehicle: a white, two-door, 1979 Oldsmobile, bearing an Indiana license plate, number 84F5245.

Shortly after receiving the report, Rice entered the information concerning the deceased into the National Crime Information Center computer and on the following day teletyped a description of the deceased and her vehicle to several regions in Texas.

William Pruitt, an assistant commander with the Texas Department of Public Safety, Narcotics Service, on November 23, 1983, received a telephone call from Bill Small, an employee with the federal government at the El Paso Intelligence Center in El Paso. Small advised Pruitt that Robison was a relative and the family desired to employ a reputable private investigator to assist in locating her. After speaking with Small, Pruitt contacted the Austin Police Department and confirmed that Robison had indeed been reported missing and that the information concerning her description and that of the vehicle was correct. At that time an officer with the Austin Police Department gave Pruitt the pertinent information concerning the deceased's disappearance, including her physical description, when she was last seen, all of the information identifying the vehicle and the license number, and the Austin Police Department case number.

Later that evening, while proceeding down Airport Boulevard in Austin, Officer Pruitt, by pure coincidence, observed a vehicle matching the description of the Robison vehicle. He drove his unmarked patrol car directly behind the vehicle, confirmed the license number and description, and determined that it was the vehicle which Robison was last known to have been using. Further, Pruitt was able to observe that the Robison vehicle was operated by a black male, and occupied by a black female and several black children. Obviously, the operator of the questioned vehicle did not match the description of Rosalind Robison.

In addition, appellant does not raise Art. I, § 9, of the Texas Constitution, therefore his point of error will be decided solely on Fourth Amendment principles.

Pruitt continued to follow and observe the vehicle as it proceeded into a Quickie–Pickie gasoline station. While the vehicle was stopped, Pruitt called the Department of Public Safety and requested that the Austin Police be contacted and that a unit meet him at the location. The dispatcher did so and also advised the Austin Police Department exactly as to what was taking place in reference to Officer Pruitt and his observations. Officer Dunny Donovan of the Austin Police Department rendezvoused with Pruitt who explained the situation to Donovan. The vehicle was followed by both officers to a Market Basket Grocery Store and kept under observation while the occupants were in the store. After their return, the vehicle left the parking lot. Immediately thereafter, Pruitt and Donovan, armed with the information provided by Pruitt, stopped the vehicle.

The driver of the automobile, later identified as the appellant, was ordered out of the vehicle where a patdown search was conducted and Donovan commenced to interview appellant as to how he came into possession of the Robison vehicle. In reply to Donovan's queries concerning the vehicle, appellant responded that a friend of his from Houston had loaned the vehicle to him at a U–Tote–M Store somewhere in Austin; however, he did not know his friend's name, how the friend got to the U–Tote–M Store or left there, and had no idea how to locate this friend. When pressed further as to this friend's name, appellant first replied it was a man by the name of *Robert Richardson.* On a subsequent inquiry, appellant interpolated the names and stated that *Richard Robertson* had loaned him the vehicle.

Appellant was then ordered to open the trunk of the automobile, where the officers discovered personal items which belonged to the deceased, including a brown purse containing her student identification card. Appellant was then placed under arrest for the unauthorized use of a motor vehicle and transported to the Travis County Jail.

Following his arrest the automobile was photographed, processed for finger prints, and searched. Several items of evidence were acquired and seized, such as finger prints, hairs, tissue papers, a tampon, a bank slip, gravel, the appellant's bank card, and the deceased's purse. Taken from the person of appellant was his check book, which contained a "Teller 24" bank card in the name of the deceased. Over appellant's objection all of the items seized were introduced into evidence during the course of the trial.

■ Although the State agrees that appellant has standing to challenge the seizure of his person and the search of his person, which they contend was made incident to a valid arrest, it asserts in its brief that the search and seizure involves two different privacy interest: (1) the appellant's interest in the automobile and, (2) the interest in his person. The State then argues appellant is in no position to challenge the search of the automobile as it was stolen; thus, he had no legitimate expectation of privacy in it.[3] The record in this case unequivocally indicates that the automobile belonged to the deceased, who at no time gave her consent to the appellant or his accomplice to be in possession of the vehicle, and hence it was stolen. In *Chapa v. State,* 729 S.W.2d 723, 727 (Tex.Cr.App. 1987), Judge Clinton, writing for the majority, aptly synthesized the complex concept of standing when he wrote:

In *Rakas v. Illinois, supra,* the substantive question of what constitutes a "search" for purposes of the Fourth Amendment was effectively merged with what had been a procedural question of "standing" to challenge such a search. It became a matter, not only of whether some "reasonable," "justifiable" or "legitimate expectation of privacy" in a particular place exists which has been breached by governmental action, *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct.

---

**3.** The State properly and timely raised the appellant's standing to the automobile at the motion to suppress.

2577, 2580, 61 L.Ed.2d 220, 226 (1979), but also of who reasonably, justifiably or legitimately harbored that expectation. The limits for determining existence of a legitimate expectation of privacy as to a particular accused is twofold: first, did he exhibit by his conduct "an actual (subjective) expectation of privacy[;]" and second, if he did, was that subjective expectation "one that society is prepared to recognize as 'reasonable.'" *Smith v. Maryland,* 442 U.S. at 740, 99 S.Ct. at 2580, 61 L.Ed.2d at 226–27.

Even assuming that appellant manifested an actual and subjective expectation of privacy in the stolen vehicle, which the record in this case surely indicates he did not, he certainly did not lawfully have a right of possession to the vehicle with the concomitant rights.[4] *Rakas v. Illinois,* 439 U.S. 128 at 144 n. 12, 99 S.Ct. 421 at 431 n. 12, 58 L.Ed.2d 387 at 401 n. 12 (1978). Appellant asserts neither a property interest nor a possessory interest in the automobile nor did he *legitimately* exercise a significant degree of control over the vehicle which would warrant one to conclude that he could exclude a peace officer from searching the vehicle. Simply put, any actual expectation of privacy appellant may have manifested in the stolen vehicle is not "one that society is prepared to recognize as 'reasonable.'" *Smith v. Maryland, id.* at 740, 99 S.Ct. at 2580. We are convinced that the *stare decisis* of this Court is applicable in the case *sub judice* and appellant lacked standing to contest the search and seizure of the stolen vehicle which he gained possession of only by reason of his criminal conduct. *Viduarri v. State,* 626 S.W.2d 749, 750 (Tex.Cr.App.1981); *Bodde v. State,* 568 S.W.2d 344, 352 (Tex.Cr.App. 1978).

The arrest and search of the appellant's person, however, presents an entirely different matter. The admissibility of the items seized from him must be guided by traditional notions of probable cause emanating from the Fourth and Fourteenth Amendments to the United States Constitution. *Appellant's argument centers on the fact that although Robison had been reported missing, the automobile was not reported as stolen, and there was nothing in the record that indicated the deceased had not loaned or given the vehicle to the appellant.* Further, the appellant asserts that at the time the peace officers stopped the vehicle they possessed no knowledge from any source that a crime had been perpetrated. We disagree.

Keeping in mind that when the peace officers in the case initially detained the appellant by stopping the vehicle the collective knowledge of all officers involved is relevant "... [as] when there has been some cooperation between law enforcement agencies or between members of the same agency, the sum of the information known to the cooperating agencies or officers at the time of an arrest or search by any of the officers involved is to be considered in determining whether there was sufficient probable cause therefor." *Woodward v. State,* 668 S.W.2d 337, 344 (Tex.Cr.App. 1982) (On motion for rehearing 1984); *Whitely v. Warden,* 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971). Officers Pruitt and Donovan, at the time they stopped the vehicle, possessed the following significant information:

(1) Rosalind Robison was last seen by her roommate, Maria Salazar, at approximately 10:30 p.m. on November 17, 1983.

(2) She (the deceased) had left her apartment at that time to go the Petroleum Engineering Building at the University of Texas, to pick-up some notes from a teaching assistant.

(3) She was supposed to have returned to the apartment within an hour of her departure.

(4) She was a twenty-four year old white female.

(5) She was known to have been driving a 1979, white, two-door Oldsmobile with Indiana license plates number

---

**4.** Looking at the record as a whole, we have grave doubts that appellant even manifested an actual and subjective expectation of privacy.

See *Crosby v. State* (Tex.Cr.App., Nos. 1128–85 & 1129–85, delivered November 12, 1987).

84F5245 at the time she left her apartment for the University.

(6) She was reported missing on November 18, 1983, by her roommate, Maria Salazar.

(7) Bill Small, a relative of Rosalind Robison, employed by the El Paso Intelligence Center, in El Paso, contacted Pruitt on November 21, 1983, concerning the retention of a private investigator to help in locating Robison. (The inference being that Robison was still missing and the family was still trying to find her.)

(8) The appellant was driving the Robison vehicle with Indiana license plates.

(9) Appellant did not match Robison's description as he was a Black male.

(10) She had been missing for several days.

■ Scrutinizing the collective information in possession of the law enforcement agencies and the individual officers involved at the time that the appellant and the other occupants of the automobile were stopped, *it cannot be validly disputed that the facts and circumstances within their knowledge justified the temporary detention of the appellant. Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Ussery v. State*, 651 S.W.2d 767, 770 (Tex. Cr.App.1983). The field investigation was appropriate and certainly warranted by the fact that an unknown man was driving the automobile of an individual who had been reported missing several days. Such "specific and articulable facts which, taken together with rational inferences from those facts ..., could only lead these officers ... to conclude in light of [their] experience that criminal activity may be afoot ...," to-wit: at the very least the unauthorized use of a motor vehicle. *Terry v. Ohio, id.* 392 U.S. 1 at 21, 88 S.Ct. 1868 at 1880. It is contradictory, illogical, and unreasonable to think that a police officer must perform his duties with his vision impaired by blinders and must ignore such suspicious conduct. As the Supreme Court in *Adams v. Williams*, stated:

In *Terry* this Court recognized that 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' [Citations omitted]. *The Fourth Amendment does not require a policeman who lacks the precise level of information necessary to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response.* [Citations omitted]. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. [Citations omitted] [Emphasis added]. *Id.*, at 407 U.S. 143, 145, 92 S.Ct. 1921, 1923.

When Officers Pruitt and Donovan stopped the vehicle being driven by the appellant they adopted the appropriate "intermediate response," *id.*, and sought to obtain more information in order to dispel any suspicions they may have had regarding foul play that was suggested by the circumstances known to them. *However, the appellant's contradictory and implausible responses to Donovan's questioning, particularly those regarding how he came to be in possession of the automobile exacerbated their suspicions.* Although we do not sanction the notion that implausible, conflicting, evasive, or unresponsive answers to police queries by a criminal suspect alone constitutes probable cause, one must recognize that "the responses they [criminal suspects] give to officers' questions," *United States v. Ortiz*, 422 U.S. 891, 897, 95 S.Ct. 2585, 2589, 45 L.Ed.2d 623, 629 (1975), can be an important factor in the determination of probable cause. See also W. LaFave, 2 *Search & Seizures* 35, 66 (2d ed. 1987). See also *United States v. Brown*, 535 F.2d 424, 428 (8th Cir.1976); *United States v. Sifuentes*, 504 F.2d 845, 847 (4th Cir.1974).

In the present case, even objectively examining the appellant's responses, it can be seen that his explanation as to how he came into possession of the Robison vehicle could only leave an inference that "criminal activity was afoot...." *Terry v. Ohio, supra.* Further, while the appellant was detained, he was not placed under arrest at this point. Rather, the officers had appellant open the trunk where several personal items of the deceased were discovered. The appellant was then placed under arrest for the unauthorized use of a motor vehicle.

Although prior to the stop the officers in question had no report that Robison's disappearance was actually connected with criminal activity, or that her vehicle was indeed stolen, the subsequent legitimate discoveries of the officers provided them with sufficient probable cause to arrest the appellant. In *Brinegar v. United States,* 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879 (1949) the Supreme Court related what it believed would constitute probable cause:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of every day life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

> \* \* \* \* \* \*

> \* \* \* Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief" an offense has been or is being committed. *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 39 A.L.R. 790 [1925]. [Emphasis added.]

5. Art. 38.14, V.A.C.C.P., reads as follows:
   A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the de-

The logical inferences stemming from the appellant's use of the Robison vehicle in the Austin area some four days after the deceased was reported missing, coupled with the evasive and implausible answers as to his acquisition of the vehicle, culminating with the discovery of the deceased's personal possessions was sufficient to provide Pruitt and Donovan with probable cause that appellant was operating the Robison vehicle without the effective consent of the owner. To hold otherwise would effectively prevent law enforcement officers from drawing inferences and making intelligent deductions from the totality of circumstances presented in any given situation. Such a limitation was not intended by the Fourth Amendment. *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The trial court therefore did not err in overruling appellant's motion to suppress.

Appellant next challenges the sufficiency of the evidence to establish his guilt for the offense of capital murder. Specifically, he asserts that the evidence fails to corroborate the testimony of the accomplice witness, James Clary, pursuant to the dictates of Art. 38.14, V.A.C.C.P.[5] Although the appellant concedes that the evidence was sufficient to corroborate the aggravating element of capital murder (robbery), he contends it was insufficient to corroborate the murder itself.

Generally, the evidence shows that in the late evening hours of November 17, 1983, the appellant and the accomplice witness, James Clary, abducted the deceased from the parking lot of the Petroleum Engineering Building on the University of Texas campus. After being abducted and sexually assaulted she was driven in her vehicle to Williamson County where she was shot in the head at close range by the appellant. Her body was discovered in a gravel pile one month later.

James Clary testified that he met the appellant at the Dismas Halfway House in

fendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

Austin, where they had discussed stealing an automobile to be utilized in future robberies. After becoming acquainted, Clary was introduced to several women by the appellant, including Pam McKinney, whose house both the appellant and Clary frequented, and on several occasions made overnight visits.

On the morning of November 17, 1983, the appellant accompanied by Clary, left the Dismas Halfway House. After spending much of the day at various locations in east Austin, the two began their search for a car. Appellant had already procured a weapon from a Ricky Johnson. The appellant and Clary carefully examined several locations in the vicinity of the University of Texas campus, and ultimately decided to extend their quest to the campus itself. Between 11:00 p.m. and midnight, Clary and appellant focused their attention on the parking lot adjacent to the Petroleum Engineering Building located on campus. At this time, they spotted the deceased walking toward her vehicle. Using the weapon they abducted the deceased and drove away in her car.

After discovering that the deceased had no money in her possession, they went to the nearest Automatic Teller Machine, and obtained some cash with the use of Robison's "Teller 24" card.

They then proceeded north on IH-35, during which time the appellant had forcible sexual intercourse with the deceased in the rear seat of the vehicle. They exited IH-35 in Williamson County, and stopped in a remote area where Clary had sexual intercourse with the victim. According to Clary, because he used appellant's name in the presence of the deceased, she was executed. Specifically, she was escorted from the parked vehicle, where her hands were bound, and near a gravel pit she was shot at point blank range in the back of the head by the appellant. After appellant made a feeble attempt to conceal the body by covering it with loose gravel, Clary and appellant left the scene in the Robison vehicle. The appellant remained in possession of it until his arrest.

The trial court instructed the jury that Clary was an accomplice as a matter of law and that it could not convict the appellant upon Clary's testimony unless it found "other evidence in the case outside the evidence of James Otis Clary ..." tending to connect the appellant with the offense charged.

In determining the sufficiency of the evidence to corroborate the testimony of an accomplice, we eliminate from consideration the accomplice's testimony, in this case that of James Clary, and examine the remaining evidence to ascertain whether it independently tends to connect the appellant to the commission of capital murder. *Reed v. State,* 744 S.W.2d 112 (Tex.Cr.App. 1988); *Gardner v. State,* 730 S.W.2d 675 (Tex.Cr.App.1987); *Killough v. State,* 718 S.W.2d 708 (Tex.Cr.App.1986). Extracting entirely Clary's testimony the record reveals the following additional evidence:

Rickey Johnson, an acquaintance of appellant and Clary, who lived within blocks of the Dismas Halfway House, testified that sometime prior to Thanksgiving in November of 1983, appellant was seeking a handgun and he (Rickey Johnson) rented appellant a handgun for twenty dollars. This handgun was returned to him after Thanksgiving by his brother, James Johnson. After the arrest of appellant Rickey became aware the Austin Police were looking for the handgun. Initially upon being contacted by a homicide investigator with the Austin Police Department, he denied any knowledge of the weapon and out of fear attempted to hinder the police probe by secreting it in a local storm drain. Ultimately, however, Rickey Johnson led homicide investigators to the weapon where they retrieved it from the sewer. Rickey's brother, James, testified and admitted that he received the weapon from Clary after Thanksgiving and returned it to Rickey at Clary's behest.

Ronald D. Richardson, a firearms expert employed by the firearms section of the Scientific Laboratory of the Texas Department of Public Safety, conducted the ballistic examination on the bullet removed from the body of the deceased and testified that

it was fired from the handgun appellant had rented from Rickey Johnson. Through Howard Hall, an investigator with the Austin Police Department, the State was able to establish that the officer retrieved the gun from Rickey Johnson, as Johnson lead the investigators to the location where it had been concealed.

Maria Salazar, the roommate of the deceased, added to her pretrial testimony by informing the jury that on the evening that Robison disappeared she was wearing a gold Seiko watch, with a small white face and little safety link chain. Additionally, she confirmed that Robison kept in the trunk of her automobile a tool kit, blanket and orange towel in case of a road emergency.

Pam McKinney, a female acquaintance of both the appellant and Clary, related that she had met the appellant some six months prior to his arrest. Further, approximately one week prior to Robison's death, Clary started to accompany appellant in his visits to the McKinney residence. When the visits first commenced neither appellant nor Clary possessed a vehicle; however, on the Friday morning prior to appellant's arrest appellant and Clary showed up at the McKinney home in the white Oldsmobile. At that time appellant chauffeured McKinney to various locations in Austin, during which time she noticed a lady's purse in the front passenger area of the vehicle. She also testified that the appellant was in possession of a lady's gold Seiko watch and had tried to give it to her sister, Linda Lindly. She, in addition, witnessed appellant the next morning wash his face with an orange towel he had taken from the vehicle. McKinney later turned the towel over to police investigators.

Linda Lindly, Pam McKinney's sister, who also lived with her at the East Austin address, testified that on November 18, 1983, she had the appellant take her to a local clinic, and as transportation appellant was driving a white, Delta 88 Oldsmobile. While in the vehicle she spotted a brown purse on the front floor board; gratuitously, appellant informed her that the purse "belonged to the friend's wife who had

loaned him the car." Her testimony also revealed that on the weekend following Robison's disappearance appellant was freely spending money buying "beer, liquor, food, weed and whatever we asked for."

Ms. Lindly partially confirmed McKinney's testimony in that she also testified that it was indeed true that appellant had requested that she keep a gold Seiko watch with a safety chain. Lindly, however, refused such request. Moreover, Lindly witnessed Clary in possession of a small caliber handgun identical to the State's Exhibit 39, which was identified as the murder weapon.

Anita Hall, the passenger in the vehicle at the time of appellant's arrest, testified that when she first met the appellant he had no vehicle; however, some three days later he was driving the white Oldsmobile.

Howard Staha, another officer with the Austin Police Department, testified he arrived at the scene of appellant's arrest and after appellant had been placed under arrest he conducted the patdown search and seized a checkbook which was on the appellant's person. Donovan buttressed this testimony by adding that in appellant's checkbook was Robison's "Teller 24" card.

Vincent J. Ewald, Senior Vice President with the Republic Bank of Austin, confirmed that the deceased had an account with the bank and had been issued a "Teller 24" card and on November 17, 1983 at 11:39 p.m., a fifty dollar withdrawal was transacted with the card on a automatic teller machine in Austin.

Through Joe Ronald Urbanousky, a chemist for the Texas Department of Public Safety, the State proved that hair fragments similar to appellant's pubic hair were found in the rear seat of the victim's vehicle and that a Negroid pubic hair found in the victims panties were microscopically the same as appellant's pubic hair.

Paul Schlachter, an identification technician, then supplemented the scientific evidence by identifying finger prints from the personal effects of Robison recovered from the trunk of the vehicle as appellants.

The above evidence was obviously in addition to the very inculpatory fact that the appellant was found in possession of the victim's vehicle and other stolen property which belonged to her.

After eliminating Clary's testimony from consideration we need only determine whether the testimony of the other witnesses or other physical evidence introduced by the State *tends to link* the appellant with the commission of the offense. *Reed v. State, supra; Brown v. State,* 672 S.W.2d 487, 488 (Tex.Cr.App.1984); *Meyers v. State,* 626 S.W.2d 778 (Tex.Cr.App.1982). We look to all the facts and circumstances introduced into evidence by the State for purposes of corroboration which may be either circumstantial or direct. *Brown v. State, id.; Paulus v. State,* 633 S.W.2d 827 (Tex.Cr.App.1982). Most importantly, it is not necessary that the corroboration *directly link* the accused to the crime or in itself be sufficient to establish guilt. *Gardner v. State, supra; Killough v. State, supra.*

■ In the instant case, the corroborating evidence shows that the appellant was with Clary shortly before the kidnapping and the next day was again in Clary's company when they both made an appearance at the McKinney residence. Although the presence of the accused in the company of the accomplice, near the time of the offense, while alone is not conclusive it nevertheless is an important factor in determining corroboration. *Killough v. State, supra,* at 708; *Brown v. State, supra.* Further, prior to the commission of the offense, neither the appellant nor Clary possessed an automobile but on November 18, 1983, the appellant appeared at the McKinney home driving the white, Delta 88 Oldsmobile, which ultimately was proven to belong to the victim. In addition, the appellant was found to be in possession of the victim's "Teller 24" card. It should also be noted that this card was not only in his possession but was on his immediate person in his checkbook. Use of the card was proven to have taken place approximately at the time of the deceased's initial abduction from the University of Texas campus.

Next, the State connected the appellant to the murder weapon. Rickey Johnson corroborated that he had rented the gun to appellant sometime before Thanksgiving 1983, and that the weapon was returned to him by his brother. In addition, pubic hair fragments and other hair samples recovered from the vehicle and the victim's panties matched the appellant's, and his finger prints were found on items which belonged to the victim which were retrieved from the trunk of the automobile. Also, several witnesses confirmed that appellant was in possession of a ladies gold Seiko watch similar to the one Robison was wearing on the evening of her death. In fact, as previously noted, the appellant made attempts to give it to Linda Lindly. Both Lindly and McKinney saw a ladies purse in the vehicle when they were passengers, and appellant openly made use of an orange towel resembling one owned by the victim. Finally, at the time of appellant's arrest he was operating the victim's vehicle. All of the State's corroborating evidence not only tends to but does directly connect appellant in the participation of the offense in this case. We therefore conclude that a rational jury could have believed that appellant was circumstantially linked to this crime, even absent the testimony of Clary. Indeed, it is inconceivable that a rational trier of fact could judge the evidence in any other manner. Therefore, we hold that the accomplice witness testimony of James Clary was more than sufficiently corroborated; thus, the evidence was sufficient to establish appellant's guilt.

The appellant next argues that the trial court committed reversible error in failing to grant appellant's motion for a mistrial during the prosecutor's argument at the close of the guilt-innocence stage of the trial because the prosecutor commented on appellant's failure to testify. In *Losada v. State,* 721 S.W.2d 305 (Tex.Cr.App.1986), this Court succinctly reiterated what we would consider as constituting a comment on the failure of a criminal defendant to testify in violation of the dictates of the Fifth and Fourteenth Amendments and as

statutorily embodied in Article 38.08, V.A. C.C.P.[6]

A prosecutor's comment on a defendant's failure to testify offends both our State and Federal Constitutions. *Nickens v. State,* 604 S.W.2d 101 (Tex.Cr. App.1980). For a statement to constitute a comment on the failure to testify, the language of such a statement must be either manifestly intended, or of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify. *Griffin v. State,* 554 S.W.2d 688 (Tex.Cr. App.1977). For an indirect comment to constitute reversible error, it must call for a denial of an assertion of fact or contradictory evidence that only the defendant is in a position to offer. *Short v. State,* 671 S.W.2d 888 (Tex.Cr.App.1984); *Johnson v. State,* 611 S.W.2d 649 (Tex. Cr.App.1981).

The prosecutor in the present case argued as follows:

Mr. Walsh: But the long and short of it, ladies and gentlemen, is they [the defense attorneys] don't have to furnish us with anything. And we did not have any obligation to tell them that Clary had lied to them. They [the defense attorneys] went to talk to Clary for one purpose in mind, and that's what Clary said. I'm not saying that they went to try to trick Clary; that's what Clary thought they went there with an idea concocting. These wouldn't concoct anything. They went with the idea of gleaning things they could use in cross-examining him and trying to accomplish their purpose in the case, and that is to have the Defendant found not guilty. Mr. Higginbotham started talking about all of those things on the board, that Mr. Anderson [second chair prosecutor in the case] put up there. And I want to talk a little bit about what he said. I may not touch everything he talked about, but I want to hit the things that I thought were high points.

He started off with that car. And at this point, before I go any further, think of what he said about each one of these as he [went] through it. He said this doesn't prove anything. He made the statement on several occasions, that in and of itself this doesn't prove anything. You put all of those things together, ladies and gentlemen, and you see the picture in this case.

He glossed over several of those things, but he [the defense attorney] talked about the car. And Mr. Anderson in putting the car up there also told you what Jackson told you, what Jackson told people about that car in particular, the first police officer he talked to with the two names of the guy from Houston. He had the car about two or three days, or something. Mr. Higginbotham or Mr. Brookshire neither one told you and no one in this case has said, "I got that car from James Otis Clary. Clary just showed up with the car and I got it." [Emphasis added.]

MR. HIGGINBOTHAM: Your Honor, I object to that argument. It comments on the Defendant's failure to testify, and I ask that the jury be directed to disregard it.

MR. WALSH: Your Honor, I think that might be a good thing. I didn't intend to have the jury take that that way.

THE COURT: All right. The objection is sustained, and the jury will disregard any indication or anything said as to whether or not the Defendant testified.

MR. HIGGINBOTHAM: I move for a mistrial, Judge.

THE COURT: Denied.

MR. WALSH: What I intended to say was that none of the witnesses who testified in this trial, the police officers or any of these other witnesses that Jackson talked to about the car, said that he

---

**6.** Article 38.08 of the Texas Code of Criminal Procedure states:

Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause.

told them he got it from Clary; that's the point I was trying to make.

■ Appellant asserts that the last sentence of the underlined quote from the prosecutor's closing argument is a direct comment on the appellant's failure to testify.

The record shows that appellant gave an implausible and contradicting explanation as to how he acquired the Robison vehicle to Officer Donovan and on at least two other occasions he informed State's witnesses that he borrowed the vehicle from a friend. Looking at the prosecutor's argument, "Mr. Higgenbotham or Mr. Brookshire [defense attorneys] neither one told you and no one in this case had said, 'I got that car from James Otis Clary. Clary just showed up with that car and I got it ...,'" in context with the other relevant portion of his argument, he was simply reminding the jury that whenever appellant explained to any witness as to how he acquired possession of the Robison car he never stated that Clary gave it to him. This was by no means a remark "... manifestly intended or of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify." *Losada v. State, id.* We also conclude that the arguments were not such that they called for a denial of an assertion of fact or contradictory evidence which only appellant was in a position to offer. Even assuming that the statements did indirectly refer to appellant's failure to testify, we find that the trial court's immediate instruction to disregard was sufficient to cure the error, if any. *Hawkins v. State,* 660 S.W.2d 65, 79 (Tex.Cr.App.1983); *Thompson v. State,* 537 S.W.2d 732, 734–35 (Tex.Cr.App.1976), *Alvarez v. State,* 478 S.W.2d 450, 452 (Tex.Cr.App.1972); see also *Gardner v. State, supra,* at 700 n. 13. Appellant's ground of error is therefore without merit and is overruled.

Appellant in his next ground of error contends that the trial court erroneously granted the State's challenge for cause against venireperson Dolly Cathey, and in his brief posits the proposition that such exclusion was in violation of the require-

ments as set out in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). However, *Wainwright v. Witt, id.,* is not even applicable.

It is true that a substantial portion of the voir dire examination of Cathey was concerned with her contradictory responses to questions regarding her attitude about the death penalty. On one occasion the State did challenge her for cause "because of her stated opposition to the death penalty." However, the defense then questioned the prospective juror and the State's challenge for cause was not granted. Consequently, the standards regarding the excusal of a prospective juror who is opposed to the death penalty as set forth in *Wainwright v. Witt, id.,* is just simply not implicated in this ground of error.

The State then began to question Cathey regarding the State's standard of proof necessary to authorize a jury to return affirmative responses to the special issues, assuming a guilty verdict has been rendered:

By Mr. Walsh:

\*    \*    \*    \*    \*    \*

With your feelings about the death penalty and if you were given these two or three questions [special issues under Art. 37.071(b), V.A.C.C.P.] to answer, could you follow that standard of a reasonable doubt or would you require the State to meet a higher burden such as beyond a shadow of a doubt or beyond all doubt before you could answer those questions "Yes?"

A. *I would have to say beyond all doubt.*

Q. So before you could—you have told the Judge and us that *you could follow the law and answer "Yes," but before could answer "Yes" to all of those questions we would have to prove that to you beyond all doubt; is that right?*

A. *Right.*

Q. So we're back sort of to square one on this law business, Mrs. Cathey. Like the Judge says, this procedure will be as he outlined. But one of the instructions under the law that he is going to give to the jury is that if they believe that the

answer to the question should be "Yes" beyond a reasonable doubt, they are to vote "Yes." And what you're telling me is, as far as the law and the instruction goes on that, *you just couldn't go along with that; you would have to have it beyond all doubt.*
A. *In my mind.*
Q. Right. So even if you felt in your mind that we had proven this beyond a reasonable doubt, you would want in your mind to have it proven to you beyond all doubt where you wouldn't have any doubt at all; is that right?
A. *Right.*

The State then sought to challenge venireperson Cathey on the ground that she would require the State to meet a higher burden of proof than the law requires it to meet. The defense attempted to rehabilitate Cathey and she did state she could follow the court's instructions. At this point, the trial court recognizing the inconsistency of Cathey's responses, intervened in an effort to have her clarify her position. The following inquiry then took place:

By the Court:

\* \* \* \* \* \*

So assuming that the maximum [burden of proof] is beyond all doubt, I mean that's what you told Mr. Walsh that you would require, beyond all doubt. *I would instruct you that the requirements are beyond a reasonable doubt, which is something less than the maximum.* How much less I don't know, something less than the maximum, beyond all doubt.

Now, the question that was asked of you is: "What would you require them to prove?" And you said beyond all doubt, which is a standard higher than beyond a reasonable doubt. So you see that?
A. Uh-huh.
Q. Then Mr. Higginbotham asked you, "But could you follow the instructions of the Court?" My instructions would be, they only have to go beyond a reasonable doubt, *not beyond all doubt.*

Now, in your mind when you're voting would you require them to go all the way beyond all doubt, or would it be beyond a reasonable doubt? Do you understand?
A. Yes.
Q. I hope—I'm not trying to—I'm trying to stay in the middle and define this without going into a definition and to explain this without going into a definition of beyond a reasonable doubt. But that's the bottom line question. You told us beyond all doubt, that that's what you mean. There's nothing wrong with that. Remember, there's no wrong answers here; okay? So there's nothing wrong with that. If that's your standard, that's fine; that's what we want you to know.

If your standard is a very strong beyond a reasonable doubt, that's fine, too. You told us beyond all doubt. *Is that what you would require, beyond all doubt?*
A. Yes.
Q. *So if I told you and I read you instructions that you got to hold the State to the burden of beyond a reasonable doubt, even though I told you that you'd say, "Well, but I feel like I've got to go beyond all doubt;" is that what you're saying to me?*
A. *Yes.* [Emphasis added.]

█ Eventually, in direct reply to the court's inquiries, Cathey conceded that in her heart she would require the State to prove that the special issues should be answered beyond all doubt before she could vote for a "Yes" answer. At that juncture, the trial court granted the State's challenge for cause.

This Court has consistently held that if a prospective juror manifests an intention to hold the State to a stricter burden of proof at either phase of a capital murder trial than that of beyond a reasonable doubt,[7] then such a venireperson is certainly subject to a State's challenge for cause, for clearly this is a "phase of the law upon which the State is entitled to rely for con-

---

**7.** For an excellent article on the various standards of proof see McCauliff, *Burden of Proof: Degrees of Belief, Quanta of Evidence, of Constitutional Guarantees?* 35 Vand.L.Rev. 1293 (1982).

viction or *punishment,*" Art. 35.16(b)(3), V.A.C.C.P. *Wilkerson v. State,* 726 S.W.2d 542 (Tex.Cr.App.1986); *Franklin v. State,* 693 S.W.2d 420 (Tex.Cr.App.1985); *Hawkins v. State,* 660 S.W.2d 65 (Tex.Cr.App. 1983); *Woolls v. State,* 665 S.W.2d 455 (Tex.Cr.App.1983). Venireperson Cathey made it abundantly clear she would require the State to prove its case at the punishment phase of the trial by a more stringent standard of proof than beyond a reasonable doubt. Therefore, finding an adequate basis in the record to support the trial court's conclusion that Cathey would hold the State to a stricter burden of proof for purposes of resolving the special issues, we hold that it was not error to sustain the State's challenge for cause.

Appellant next raises three related grounds of error for which he neither recites the factual context of the proposed errors or presents any legal authority. First, appellant argues that the trial court erred in denying appellant's motion to attach a number (nine) of prospective jurors who were summoned and did not appear. The trial court had assembled those persons who had been summoned as jurors in this case and the clerk then called the names of the absent jurors who are the subject of the ground of error. After numerous prospective jurors were disqualified or excused, the trial court took its noon recess. Upon returning from the lunch break both the defense and the State announced ready, and the appellant was arraigned. The appellant then moved for writs of attachment for "those jurors who did not show up." The trial court denied the motion.

Article 35.01, V.A.C.C.P., provides:

When a case is called for trial and the parties have announced ready for trial, the names of those summoned as jurors in the case shall be called. Those not present may be fined not exceeding fifty dollars. *An attachment may issue on request of either party for any absent summoned juror, to have him brought forthwith before the court.* A person who is summoned but not present, may upon an appearance, before the jury is qualified, be tried as to his qualifications

and impaneled as a juror unless challenged, but no cause shall be unreasonably delayed on account of his absence. (Emphasis added).

In *Porter v. State,* 623 S.W.2d 374, 377 (Tex.Cr.App.1981) this Court held that the verb "may" indicates that attachment of absent jurors is directory and not mandatory. In order for the denial to constitute reversible error it is incumbent on the appellant to establish that an injury occurred by the trial court's failure to grant his request for attachments. *Dent v. State,* 504 S.W.2d 455 (Tex.Cr.App.1974); *Stephenson v. State,* 494 S.W.2d 900, 906 (Tex.Cr.App.1973); *Brown v. State,* 475 S.W.2d 938, 946 (Tex.Cr.App.1971). No abuse of the trial court's discretion has been shown; appellant's ground of error is therefore overruled.

Second, appellant complains that the trial court excused a number of prospective jurors without any reason being given. After the prospective jurors' excuses were heard and their qualifications tried, and after the announcements of ready and arraignment, the appellant interposed an objection to the "exclusion from the original panel of some of the following people...." The appellant's objection was that "the current array of this jury was not in compliance with the Code of Criminal Procedure.... It's all found in 35.04. I've cited to the court 35.01 and Article 35.04.... What we are complaining about are those who were summoned for jury duty that for—either did not comply with the statute as far as excuses are concerned and were still dismissed from the overall panel, or the ones that just didn't show up and we have no reason to know why they didn't show up." Yet the, appellant has failed to demonstrate harm by showing that he was forced to accept an objectionable juror. *Esquivel v. State,* 595 S.W.2d 516, 523 (Tex.Cr.App.1980), *cert. denied,* 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251; *Porter v. State, supra; Stephenson v. State, supra,* at 905 n. 5. Consequently, no error is shown. Accordingly, appellant's ground of error is overruled.

■ Third, and similar to but distinctly different from the immediately preceding ground of error, the appellant contends that the trial court erred in denying his motion to quash the jury panel. *After* the jury panel had been qualified, but before the voir dire had commenced, appellant presented his motion to the trial court to quash the jury panel. It in essence alleged that over sixty prospective jurors were excused by unknown persons and that writs of attachment had been denied. The affidavit which accompanied the motion stated only that approximately one-half the jurors summoned "had been made available for selection." The trial court denied the motion.

Article 35.06, V.A.C.C.P., provides as follows:

> The court shall hear and determine a challenge to the array *before* interrogating those summoned as to their qualifications. [Emphasis added.]

and Article 35.10 provides:

> When no challenge to the array has been made, or if made, has been overruled, the court shall proceed to try the qualifications of those present who have been summoned to serve as jurors.

Thus, appellant's motion was not timely. As noted, Article 35.06, V.A.C.C.P., requires a challenge to the array to be presented before those summoned are interrogated as to their qualifications. Appellant's failure to timely raise the challenge before the panel is qualified by the trial court constituted a waiver of the opportunity to challenge the array. *Esquivel v. State, supra,* at 523. In addition, the record fails to demonstrate harm by showing that the appellant was forced to accept an objectionable juror or that he was denied an impartial jury. *Neal v. State,* 689 S.W.2d 420, 424 (Tex.Cr.App.1984); *Esquivel v. State, supra,* at 523.

■ In appellant's last ground of error he claims that the trial court erred in admitting a gruesome photograph that was inflammatory and prejudicial. In his brief the appellant merely states that the record reflects that over his objection a gruesome photograph of the deceased was admitted

with no other purpose than to inflame the minds of the jury and prejudice them against him. Appellant does not specify which of two photographs form the basis of the complained error, nor does he cite any authority to support his contention. Because of the grave consequences which this case presents, like the three previous grounds of error we will endeavor to review his claim.

During the trial the State offered two photographs of the deceased prior to the performance of an autopsy. Regarding the introduction of photographs depicting a deceased in such a condition, this Court in *Martin v. State,* 475 S.W.2d 265, 267 (Tex. Cr.App.1972) held:

> We hold that if a photograph is competent, material, and relevant to the issue on trial, it is not rendered inadmissible merely because it is gruesome or might tend to arouse the passions of the jury, *unless it is offered solely to inflame the minds of the jury. If a verbal description of the body and the the scene would be admissible, a photograph depicting the same is admissible.* (Emphasis added) (footnotes omitted).

We find that the photographs herein are competent, material, and relevant to the issues that were raised at trial. State's Exhibit 59, the first photograph that appellant objected to, demonstrates the condition in which the body was found. The body could be seen fully dressed with the hands of the deceased bound behind her back with a blue bandana similar to the one that witnesses testified appellant owned. This photograph illustrated relevant facts as to the clothing which was essential to proving the identity of the deceased and the manner in which her arms were bound. The second photograph, State's Exhibit 60, clearly showed the fatal wound and was relevant as to its location and illustrated the facts which led the medical examiner to conclude that it was a contact wound. The trial court did not abuse its discretion in admitting either photograph. See *Adams v. State,* 685 S.W.2d 661, 668 (Tex.Cr.App. 1985); *Burks v. State,* 583 S.W.2d 389 (Tex.Cr.App.1979), *cert. denied,* 448 U.S.

907, 100 S.Ct. 3050, 65 L.Ed.2d 1136 (1980). This ground of error is also overruled.

The judgment of the trial court is affirmed.

TEAGUE, J., dissents to disposition of Ground of Error No. One.

CLINTON, Judge, concurring.

The majority of the Burger Court was wont to quote that refrain from the 1949 opinion of the Supreme Court in *Brinegar v. United States* which Judge Duncan reproduces and underscores in his opinion of the Court, at page 10. It appears in several opinions written by Justice Rehnquist before his ascension to Chief Justice. See, e.g., *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983); *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983); see also similar treatment in the Per Curiam opinion in *Massachusetts v. Upton*, 466 U.S. 727, 732, 104 S.Ct. 2085, 2087, 80 L.Ed.2d 721 (1984).

What is often overlooked, however, is that *Brinegar*, like *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), involved importing intoxicating liquor in an automobile on public highways. A majority of the Supreme Court had no difficulty finding that *Carroll* had been correctly decided and concluding that there was not "any substantial basis for distinguishing this case from the Carroll case."

*Id.*, 338 U.S. at 176–178, 69 S.Ct., at 1311–1312. That is about the extent of its rationale.[1]

Justice Robert H. Jackson, joined by Justices Frankfurter and Murphy, took a different view of the problem. Fresh from Nuremburg, he protested:

"[Fourth Amendment rights] are not mere secondary rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police.

.... *Since the officers are themselves the chief invaders, there is no enforcement outside of court.*"

*Id.*, at 180–181, 69 S.Ct., at 1313. Then for reasons articulated he denounced the opinion of the Supreme Court as a unwarranted extension of *Carroll*. *Id.*, at 183–188, 69 S.Ct., at 1314–1317.[2]

---

**1.** "Both cases involve freedom to use public highways in swiftly moving vehicles for dealing in contraband, and to be unmolested by investigation and search in those movements. In such a case the citizen who has given no good cause for believing he is engaged in that sort of activity is entitled to proceed on his way without interference. But one who *recently and repeatedly has given substantial ground for believing that he is engaging in the forbidden transportation in the area of his usual operations* has no such immunity, *if the officer* who intercepts him in that region *knows that fact* at the time he makes the interception and the *circumstances* under which it is made *are not such as to indicate the suspect is going about legitimate affairs.*"
*Id.*, 338 U.S., at 176–177, 69 S.Ct., at 1311, (Emphasis mine here and throughout unless otherwise noted.)

**2.** As to whether the officers who pursued and stopped Brinegar were acting out of "considera-

tions of everyday life on which reasonable and prudent men [act]," Justice Jackson provided an insight ignored by the majority, *viz:*

"I think we cannot say the lower courts were wrong as matter of law in holding that there was no probable cause up to the time the car was put off the road and stopped.... When these officers engaged in a chase at high speeds dangerous to those who participated, and to other lawful wayfarers, and ditched the defendant's car, they were either taking the initial steps in arrest, search and seizure, or they were committing a completely lawless and unjustifiable act. That they intended to set out on a search is unquestioned, and there seems to be no reason to doubt that in their own minds they thought there was cause and right to search. They have done exactly what they would have done, and done rightfully, if they had been executing a warrant. At all events, whatever it may have lacked technically of arrest, search and sei-

In the instant cause, as I understand the discussion preceding and citation of *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), Maj. opinion, at pages 9–10, the majority is addressing the stop made by Commander Bill Pruitt and Officer Dunny Donovan as a "*Terry* stop." See *Cortez*, supra, at 421–422, 101 S.Ct., at 697 (test not whether officers had "probable cause to conclude" vehicle would contain aliens, but whether "based on the whole picture, they, as experienced Border patrol officers, could reasonably surmise" vehicle was engaged in criminal activity).

The opinion in *Cortez* is the first effort by the Supreme Court to expand and apply *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to an "investigative stop" of moving motor vehicle. In that type of situation the Supreme Court went through an analysis that is not based on the refrain in *Brinegar*—neither *Brinegar* nor its followings, most notably *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), are cited in *Cortez*. Rather than "factual and practical consideration of everyday life on which reasonable and prudent men [act]," the *Cortez* analysis focuses on "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.*, at 449 U.S., at 417–418, 101 S.Ct., at 695. That basis, in turn, contains two elements, the first of which is an assessment based on all the circumstances, *viz:*

"The analysis proceeds with various objective observations, information from police reports, if such are available and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a *trained officer* draws inferences and makes deductions—*inferences and deductions that might well elude an untrained person.*

.... Finally, the evidence thus collected must be seen and weighed ... as understood by those *versed in the field of law enforcement.*"

*Id.*, at 418, 101 S.Ct. at 695.

Thus while peace officers still deal with "probabilities," the *Cortez* formulation demands probabilities be assayed not by "considerations of everyday life [acted on by] reasonable and prudent men," but on all incriminating circumstances as understood by trained peace officers versed in law enforcement. Indeed, in finding probable cause the Supreme Court seems to be moving away from the dogma of *Brinegar* toward the "particularized suspicion" of *Cortez*. See *Texas v. Brown*, supra, 460 U.S., at 742–743, 103 S.Ct., at 1543.[3] See also *Illinois v. Gates*, supra, 462 U.S., at 231–232, 103 S.Ct., at 2328–2329.

With those observations I join the judgment of the Court.

---

zure, it was a form of coercion and duress under official authority—and a very formidable type of duress at that.

.... [W]hen a car is forced off the road, summoned to stop by a siren, and brought to a halt under such circumstances as are here disclosed, we think the officers are then in the position of one who has entered a home: the search at its commencement must be valid and cannot be saved by what it turns up. [Citations omitted].

The findings of the two courts below make it clear that this search began and proceeded through critical and coercive phases without the justification of probable cause. What it yielded cannot save it."

**3.** Thus the officer "possessed probable cause to believe" a balloon contained "an illicit substance" because:

"Maples testified that he was aware, both from his participation in previous narcotics arrests and from discussions with other officers, that balloons tied in the manner of the one possessed by Brown were frequently used to carry narcotics. This testimony was corroborated by that of a police department chemist who noted that it was 'common' for balloons to be used in packaging narcotics." In addition, Maples was able to observe the contents of the glove compartment of Brown's car, which revealed further suggestions that Brown was engaged in activities that might involve possession of an illicit substance."