925 P.2d 379

STATE of Hawai'i, Plaintiff–Appellee,

v.

James Gilbert KAHOONEI,
Defendant–Appellant.

No. 17201.

Intermediate Court of Appeals of Hawai'i.

May 10, 1995.

Certiorari Granted May 25, 1995.

Ray Allen Findlay, Honolulu, for defendant-appellant.

Donn Fudo, Deputy Pros. Atty., City and County of Honolulu, Honolulu, for plaintiff-appellee.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

WATANABE, Judge.

Defendant–Appellant James Gilbert Kahoonei (Defendant) appeals from the Judgment, Guilty Conviction, and Sentence entered by the First Circuit Court on May 20, 1993, following his jury conviction of two counts of possession of a firearm and ammunition by a person convicted of certain crimes (illegal firearms possession), violations of Hawai'i Revised Statutes (HRS) § 134–7(b) and (f) (Supp.1992), and one count of harassment, a violation of HRS § 711–1106(1)(a) (1985).

Defendant's sole contention on appeal is that the motions court erred in failing to grant his motion to suppress certain evidence which he claims was obtained in violation of the Fourth Amendment, pursuant to a warrantless search of his bedroom by his mother, who was then acting as an agent of the State and under police coercion.[1]

For the reasons set forth below, we reverse the denial of the motion to suppress, affirm the judgment with respect to the harassment conviction, vacate the judgment with respect to the two counts of illegal firearms possession, and remand for a new trial.

## BACKGROUND

The charges against Defendant arose out of an August 3, 1990 domestic dispute between Defendant and his live-in girl friend, Denise Tamanaha (Tamanaha), during which Defendant allegedly brandished a gun, threatened suicide, and fired two shots. Frightened by what was going on, the eleven-year-old daughter of Defendant and Tamanaha (Daughter) ran next door to a neigh-

---

1. Defendant has not alleged any error with respect to his conviction for harassment.

bor's house and called the police to report the disturbance and gunshots. Several police officers[2] responded to the call shortly thereafter.

Among the first officers to arrive at Defendant's residence[3] were Darryl Kon (Officer Kon) and Benton Akina (Officer Akina). When they arrived, Tamanaha and Defendant's mother, Angeline Kahoonei (Mrs. Kahoonei), were standing in the front yard of the residence. Officers Kon and Akina approached the two women and informed them that the officers were investigating a report of gunshots. Tamanaha responded that she and her boyfriend, later identified as Defendant, had had an argument, but that it was over and no one was hurt. Tamanaha also indicated that no guns had been involved in their argument, but Defendant had thrown some items around which had caused a loud noise. Tamanaha also related that Defendant was in the residence and was fine.

After learning that Mrs. Kahoonei was the owner of the residence in question, the officers asked her permission to enter the residence to speak to Defendant. According to the officers, Mrs. Kahoonei gave them permission, and Tamanaha led the way, as four police officers entered the residence.

While the officers were inside the residence, Defendant grabbed Officer Kon. A brief scuffle ensued, and Defendant was arrested for harassment and taken outside.

After Defendant had been secured in a police car, Officer Akina and another police officer, Sergeant Rosaline Lenchanko (Sergeant Lenchanko), reentered the residence with Mrs. Kahoonei and Tamanaha and began interviewing the women about the incident. While interviewing Tamanaha, Officer Akina noticed a hole in the living room floor "which penetrated to the underneath of the house." Transcript (Tr.) 12/23/91, at 20. Based on his experience and training, Officer Akina determined that the hole had been caused by a gunshot.

Officer Akina informed Sergeant Lenchanko of the presence of the bullet hole. Shortly thereafter, Sergeant Lenchanko told Mrs. Kahoonei and Tamanaha that a warrant "could be gotten to search the house" and a search "would be done anyway." Tr. 2/7/92, at 48.

Sergeant Lenchanko subsequently took Tamanaha into another room of the house to interview her and obtain her statement, and Officer Akina proceeded to interview Mrs. Kahoonei in the living room. While talking to Mrs. Kahoonei, Officer Akina pointed to the hole in the floor and remarked that "if at any time there was a gun involved in an argument and the gunshot had fired, it could have fired in a different direction and someone might have got hurt." Tr. 12/23/91, at 22. According to Officer Akina, "[Mrs. Kahoonei] stopped for a moment and then she said that she would check the bedroom for a firearm." *Id.*

Officer Akina claimed that he informed Mrs. Kahoonei that for safety reasons he could not allow her to go into the bedroom alone to look for the gun. Mrs. Kahoonei then permitted him to accompany her to Defendant's bedroom. Officer Akina never entered the bedroom. Instead, he stood in the doorway and watched as Mrs. Kahoonei walked over to an open closet and "bent down, reached into the closet area just above the trash bags, stood back up, holding within her right hand a revolver[.]" *Id.* at 24. Mrs. Kahoonei then handed the gun to Officer Akina, who testified at trial that Mrs. Kahoonei was acting "nervous, anxious to get rid of

---

2. The record indicates that at least six police officers arrived at the scene. At the hearing on the motion to suppress, Officer Benton Akina testified that he arrived at the scene at 7:13 a.m., and "Officer Kon responded almost exactly the same time as I did. Officer Chan also. [Officer] Headle came after that. And there were a few other officers after them." Transcript 2/7/92, at 6–7. Subsequent testimony established that Sergeant Rosaline Lenchanko and Officer Robert Silva were also present at the scene.

3. The residence was owned by Mrs. Angeline Kahoonei (Mrs. Kahoonei), the mother of Defendant–Appellant James Gilbert Kahoonei (Defendant), and Defendant apparently rented one of the bedrooms. Defendant resided there with his live-in girl friend, Denise Tamanaha, their two daughters, Defendant's brother, and Mrs. Kahoonei.

[the firearm]."[4]  Tr. 2/22/93, at 13.  According to Officer Akina, as he was about to leave the bedroom, Mrs. Kahoonei turned to him and said, "You might as well take this[.]" Tr. 12/23/91, at 24.  She then pointed to the bottom of the bed and picked up and handed to Officer Akina a brown, half-opened revolver case, which contained a yellow box with some rounds of ammunition.

Mrs. Kahoonei then followed Officer Akina outside the residence, where she gave a signed written statement to the police.  In her written statement, Mrs. Kahoonei indicated that the argument between Defendant and Tamanaha had started the night before, when Defendant returned home late from work.  The argument resumed in the morning, and Defendant and Tamanaha began bumping and grabbing each other, as well as yelling at each other.  According to Mrs. Kahoonei's signed statement:

> [Defendant] went into the room (bedroom) and came out with the handgun.
>
> [Defendant] pointed the gun at the right side of his head.  I saw this and got scared and grabbed his tank top from the back pulling him backwards.  I used my left hand to pull him and with my right hand I reached over his shoulder and jerked his right hand downwards.
>
> The gun went off at this time, causing a hole in the floor.
>
> [Defendant] went into the bedroom by himself.
>
> I heard a second shot, I ran to the bedroom and saw [Defendant] sitting on the bed.  He threw the gun into the closet.
>
> When the police came [Defendant] got arrested after he began arguing with them.
>
> After the police spoke to me, I walked into the bedroom and got the handgun and turned it over to the police officer.
>
> I then got the gun case and gave the case to the police officer, also.

State's Exhibit 3.

Written statements were also obtained that day from Tamanaha and Daughter.

Both Tamanaha and Daughter described how Defendant, following an argument with Tamanaha, had retrieved a gun, aimed it at his head, and then fired a shot once into the living room floor.  Daughter's statement also described how Defendant had run into their room and fired another shot.

## PROCEDURAL HISTORY

Defendant was subsequently charged with two counts of illegal firearms possession and one count of harassment.  On November 19, 1990, Defendant filed a motion to suppress evidence, seeking to exclude all items recovered by the police with the assistance of his mother.  Defendant claimed that the police did not have his permission to enter his bedroom, where the evidence had been recovered, and his mother did not have authority to consent to a search of his bedroom. Defendant further argued that the police had coerced his mother into retrieving the evidence from his bedroom and turning it over to them, and that the search could not be justified as a protective search for weapons or a search incident to arrest.

At the hearing on the motion, Mrs. Kahoonei's recollection as to what transpired on the day in question differed from what she had written in her previous statement.  Mrs. Kahoonei testified that she had been informed by the police that they would get a search warrant to search her house if she did not surrender the gun.  They also threatened to "tear up" and confiscate her house, arrest her and Tamanaha, find contraband not pertaining to a gun, and possibly take her grandchildren away.  Because of such coercion, she entered Defendant's bedroom, accompanied by a police officer, to retrieve the gun, and while there, the officer found and recovered the ammunition.  Mrs. Kahoonei admitted on cross-examination, however, that she had never mentioned any alleged threats in her written statement.  She also admitted that she was not threatened to make the

---

4.  In determining an appeal of the denial of a motion to suppress, an appellate court is not limited to considering only the testimony received at the hearing on the motion.  3 C. Wright, *Federal Practice and Procedure: Criminal*  *2d* § 678 at 805 (1982).  "[T]he appellate court considers both the record of the hearing on the motion to suppress and the record of the trial." *State v. Kong*, 77 Hawai'i 264, 266, 883 P.2d 686, 688 (App.1994).

written statement, which she read and understood before signing.

Tamanaha similarly testified at the hearing that, for at least an hour and a half, the police had threatened to send her to jail if she did not get the gun. The police also had threatened to "tear up" the house to find the gun. Tamanaha admitted on cross-examination, however, that she never mentioned these alleged threats in her handwritten statement.

The State's witnesses denied that any threats had been made to Mrs. Kahoonei. However, Officer Akina admitted that he had overheard Sergeant Lenchanko mention, in the presence of Mrs. Kahoonei and Tamanaha, that a search warrant "could be obtained to search the house" and the search "would be done anyway." Tr. 2/7/92, at 48.

At the conclusion of the hearing, the motions court denied Defendant's motion to suppress but did not enter written findings of fact and conclusions of law. As required by Hawai'i Rules of Penal Procedure (HRPP) Rule 12(e), however, the court did "state its essential findings on the record." In relevant part, the motions court orally stated as follows:

> Mrs. Kahoonei had the authority to give consent to the officers to enter the house, as she represented that she was the owner of the house, and did give her consent to the officers to enter. The officers lawfully arrested [D]efendant in the hallway, based on their right to be within the residence. The Court notes that a hallway is a common area over which the owner of a residence has dominion and control.
>
> Further, the exigency, at that time, because gunshots had been reported and because it appeared that the suspect was still within the residence, and the threat to personal safety, supported the action of the police. Once [D]efendant was removed from the premises and arrested, he did not pose any further danger.
>
> The Court concludes that [D]efendant had a right to privacy in his bedroom area. And Mrs. Kahoonei could neither consent, as owner of the house, to search of the bedroom, nor could she validly waive [D]efendant's right to privacy in the bedroom.

The recovery of the gun would be illegal, therefore, if the officers had searched the bedroom for the weapon. Based on the facts, the Court concludes that the police did not search the bedroom.

The question, then, is whether Mrs. Kahoonei entered into the bedroom acting under the direction of or under the instruction of the police so that she conducted a search as an agent. This determination is necessary because it is police and state action which is prescribed [sic] by law, not private action. While there is no question that [Officer] Akina appealed to Mrs. Kahoonei, as to her sense of reason and to her conscience, in advising her of the risk of harm or injury that a handgun could cause, the Court concludes, based on the totality of the evidence and the credibility of the witnesses, that [Mrs.] Kahoonei entered into her son's room to recover the handgun and that she did so as her personal agent and not on behalf of [Officer] Akina or the police department.

The Court finds no unlawful search based on any agency relationship and concludes that no state action existed; therefore, the Court denies the motion to suppress.

Tr. 12/30/92, at 4–6. No written order denying the motion to suppress was ever entered by the court.

Defendant's jury trial commenced on February 19, 1992. At trial, Mrs. Kahoonei, Tamanaha, and Daughter all testified that it was Mrs. Kahoonei, rather than Defendant, who had fired the gun on the occasion in question. Mrs. Kahoonei admitted that she had searched for and retrieved the gun from the closet, but claimed that it was the police who noticed the gun case and picked it up. After the jury returned a guilty verdict against Defendant on all counts, Defendant was sentenced to imprisonment for two ten-year terms and one thirty-day term, to be served concurrently. This timely appeal followed.

## DISCUSSION

### I. *Government vs. Private Searches*

It is well-established that the Fourth Amendment to the United States

Constitution[5] applies only to searches and seizures carried out by the government. *Burdeau v. McDowell,*[6] 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921); *State v. Furuyama,*[7] 64 Haw. 109, 120, 637 P.2d 1095, 1102 (1981). Consequently, an unreasonable search or seizure by a private individual does not violate the Fourth Amendment, and evidence obtained as a result of a private search may be admitted in a criminal prosecution against the victim of the search. *Burdeau,* 256 U.S. at 476, 41 S.Ct. at 576.

The corollary to the foregoing principle is that:

> An ostensibly private search is nevertheless governmental action if instigated by the authorities or if government agents participated therein. Hence, "a search ... physically conducted by a private individual but only at the government's initiation and under their guidance ... is not a private search...." And "where civilians 'act as agents of the police ... the full panoply of constitutional provisions and curative measures applies.' ...."

*Furuyama,* 64 Haw. at 120, 637 P.2d at 1102 (citations omitted).

The determination of whether an ostensibly private search constitutes governmental action for Fourth Amendment purposes depends on the extent of governmental participation involved. *State v. Boynton,* 58 Haw. 530, 536, 574 P.2d 1330, 1334 (1978). "[T]here is no bright line that distinguishes instances of 'government' conduct from instances of 'private' conduct," *United States v. Miller,* 688 F.2d 652, 656 (9th Cir.1982), and private searches that fall within the " 'gray area' between the extremes of overt governmental participation in the search and the complete absence of such participation" must be resolved on a case-by-case basis. *United States v. Walther,* 652 F.2d 788, 791 (9th Cir.1981).

In *State v. Boynton,*[8] the Hawai'i Supreme Court analyzed a composite of factors to

---

5. The Fourth Amendment provides:

   The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation and particularly describing the place to be searched, and the persons or things to be seized.

6. *Burdeau* involved a company representative and a private detective who had broken into a safe and a personally owned desk, stolen incriminating papers belonging to a fired employee, and turned such papers over to the federal government. In a subsequent civil action by the employee for return of the papers, which were about to be presented to a grand jury, the United States Supreme Court stated:

   The Fourth Amendment gives protection against unlawful searches and seizures, and ... its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies....

   In the present case the record clearly shows that no official of the federal government had anything to do with the wrongful seizure of the petitioner's property, or any knowledge thereof until several months after the property had been taken from him.... It is manifest that there was no invasion of the security afforded by the Fourth Amendment against unreasonable search and seizure, as whatever wrong was done was the act of individuals in taking the property of another.

   *Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921).

7. In *Furuyama,* a defendant was arrested for "promoting pornography" after several citizens, accompanied by a police officer, went to an adult bookstore where defendant was employed, leafed through several magazines, decided they were pornographic in character and content, and handed them to the police officer, who then "purchased" the magazines, arrested the defendant, and impounded the publications as evidence of the crime. The trial court found that the citizens' group and the police had acted in concert to effect a warrantless search and seizure and dismissed the charges against the defendant. On appeal, the supreme court affirmed the trial court's finding that the search and seizure were improper, but held that the proper remedy was suppression of the evidence, rather than dismissal of the charges. *State v. Furuyama,* 64 Haw. 109, 120–23, 637 P.2d 1095, 1103–04 (1981).

8. *Boynton* involved a paid informant who told police that he had climbed a high fence surrounding the defendants' residence and seen two marijuana bushes. The informant later accompanied a police officer to the residence. Although the officer did not climb the fence himself to see the plants, he used the information provided by the informant to obtain a search warrant and arrest the defendants.

   The supreme court held that the informant was acting as an agent of the State when he unrea-

determine whether an agency or "symbiotic" relationship existed between the police and a private individual who had conducted a search of the defendants' residence: (1) whether the police officer "actively recruited" the private individual, (2) whether the police officer "specifically directed" the private individual to conduct the search, (3) the purpose or motivation of the private individual in conducting the search, and (4) whether the private individual received payment from the government for conducting the search. *Boynton*, 58 Haw. at 537–39, 574 P.2d at 1335–36.

The supreme court held that the most prominent indication of an agency relationship was the police officer's admission that he had previously approached the private individual, requested drug information, offered to pay for the same, and thus actively recruited the private individual. *Id.* at 537, 574 P.2d at 1335. This recruitment, according to the supreme court, made the private individual a "government . agent for fourth amendment purposes," and "imposed upon the [private individual] the constitutional requirement that is imposed upon the officers' searches." *Id.*

Having found recruitment, the supreme court deemed it "irrelevant" to examine the second factor, whether police specifically directed the private individual regarding the conduct of the search. *Id.*

Regarding the third factor, the supreme court observed that the private individual did "not seem to have had a reason for being at the [defendants'] residence or for searching the area enclosed by the fence which is not inexorably linked to police concerns." *Id.* The court further noted that it " 'appears as

a matter of law that the [private individual] who conducted the search did so neither as a private citizen or for a private purpose.' " *Id.* (quoting *Dyas v. Superior Court*, 11 Cal.3d 628, 633, 114 Cal.Rptr. 114, 118, 522 P.2d 674, 678 (1974)).

Finally, the court noted that the private individual had been paid $30 for the information relating to that case and had been paid an aggregate of approximately $100 over the one-year period he had been working for the officer. *Id.* 58 Haw. at 533, 574 P.2d at 1333. The court said that "payment made by the government to the informant may be considered with the other surrounding circumstances to determine if an informant was acting as an instrument of the government or if his search must be deemed governmental." *Id.* at 538, 574 P.2d at 1335.

Unlike *Boynton*, which involved a police informant,[9] this case involves a private citizen who provided information to the police during the course of a police investigation. Mrs. Kahoonei was neither "actively recruited" nor paid by police for the evidence she turned over to police, and, indeed, in the normal private citizen case, it would be rare to find the presence of these two factors of the *Boynton* test. Where private citizens are involved in a search, therefore, the second and third factors of the *Boynton* test take on paramount significance.

Our inquiry in determining whether Mrs. Kahoonei was acting as a government agent, then, focuses on factors 2 and 3: the extent of police direction of Mrs. Kahoonei's search, and the purpose or motivation of Mrs. Kahoonei in performing the search.[10] We address each of these factors in turn.

sonably "searched" the defendants' residence, thus violating the defendants' rights under the Fourth Amendment and article I, section 5 (now section 7) of the Hawai'i Constitution. *State v. Boynton*, 58 Haw. 530, 540, 574 P.2d 1330, 1336 (1978).

9. *Black's Law Dictionary* 779 (6th ed. 1990) defines "informant" by referring to the following definition of "informer":

An undisclosed person who confidentially discloses material information of a law violation, thereby supplying a lead to officers for their investigation of a crime. *This does not include*

*persons who supply information only after being interviewed by police officers, or who give information as witnesses during course of investigation.*
*Id.* at 780 (citations omitted, emphasis added).

10. Other courts have adopted a similar two-pronged test in evaluating whether a private individual conducted a search as an agent of the government. *See, e.g., United States v. Lambert*, 771 F.2d 83, 89 (6th Cir.1985) ("A person will not be acting as a police agent merely because there was some antecedent contact between that person and the police. Rather, two facts must be shown. First, the police must have instigated,

### A. *Police Direction of the Private Search*

■ Courts generally hold that where a search of another person's property is conducted by a private party upon his or her own initiative, without any involvement by the police, evidence recovered during the search is admissible at trial. *Seē, e.g., United States v. Lambert,* 771 F.2d 83 (6th Cir. 1985) (cocaine discovered by defendant's housekeeper and brought to police); *United States v. Phelps,* 526 F.Supp. 686 (W.D.Okl. 1981) (search of defendants' business and seizure of box of records by former secretary and bookkeeper on her own volition); *State v. Loyd,* 126 Ariz. 364, 616 P.2d 39 (1980) (search by bus company employees of trunk found in bathroom of bus terminal); *Gunter v. State,* 257 Ind. 524, 275 N.E.2d 810 (1971) (search for stolen items by victim of theft without any knowledge or supervision of police); Annotation, *Admissibility, in Criminal Case, of Evidence Obtained by Search by Private Individual,* 36 A.L.R.3d 553, at § 8 (1971) (hereafter Annot., 36 A.L.R.3d 553); W.R. LaFave, 1 *Search and Seizure* § 1.8(a), at 177 (1987).

■ On the other hand, where a private individual conducts a search of another person's property at the specific suggestion, order, direction, or request of the police, or where police officers plan or participate in a private search, an agency relationship with the government is established for purposes of the Fourth Amendment, the search is deemed unreasonable, and evidence recovered in the search must be excluded at trial. *See, e.g., Corngold v. United States,* 367 F.2d 1 (9th Cir.1966) (customs agents asked airline transportation agent to open a package placed with the airline for shipment, then joined actively in the search by holding open the flaps of the large package so its contents could be viewed; removing, opening, and inspecting the contents of the small boxes

which it contained; and marking the small boxes for future identification); *United States v. Klopfenstine,* 673 F.Supp. 356 (W.D.Mo.1987) (landlord entered tenant's apartment to seize impressions of $20 bills at the direction of police department, for purposes of obtaining evidence for police); *Stapleton v. Superior Court of Los Angeles County,* 70 Cal.2d 97, 73 Cal.Rptr. 575, 447 P.2d 967 (1968) (credit card agent searched automobile as part of joint operation planned by police and credit card agents and aimed at arresting automobile's owner and obtaining evidence against him); *Raymond v. Superior Court, County of Sacramento,* 19 Cal.App.3d 321, 96 Cal.Rptr. 678 (1971) (defendant's twelve-year-old son searched defendant's dresser drawer, and sheriff's sergeant participated in the foray by ascertaining time of search, supplying transportation, describing quantity of drugs to be seized, and waiting for purloined evidence); *State v. Scrotsky,* 39 N.J. 410, 189 A.2d 23 (1963) (detective accompanied theft victim into defendant's apartment on three successive days, including the day the stolen goods were recovered); Annot., 36 A.L.R. 553 § 9; 1 W.R. LaFave *Search and Seizure* § 1.8(a), at 178–92.

■ The mere fact that government agents were present at the time and place of a private search does not automatically convert a private search into one conducted by the government, especially where the private party had a legitimate independent motivation for conducting the search. *Walther,* 652 F.2d at 792. In order to transform a private citizen into an agent of the state for Fourth Amendment purposes, the government must be involved in the search, either directly as a participant or indirectly as an active encourager of the private citizen's actions; *de minimis* or incidental contacts between a private citizen and law enforcement agents are not enough. *Id.; People v. Henderson,* 38 Colo. App. 308, 559 P.2d 1108 (1976); *People v.*

encouraged, or participated in the search. Second, the individual must have engaged in the search with the intent of assisting the police in their investigative efforts." (Citations omitted)); *United States v. Miller,* 688 F.2d 652, 657 (1982) ("From our review of earlier cases, we discerned that two critical factors in the [government] 'instrument or agent' analysis are: (1) whether the government knew of and acquiesced in the intru-

sive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends."); *United States v. Walther,* 652 F.2d 788, 792 (1981) ("It is clear ... that two of the critical factors in the [government] 'instrument or agent' analysis are: (1) the government's knowledge and acquiescence, and (2) the intent of the party performing the search.")

*Barber,* 94 Ill.App.3d 813, 815, 50 Ill.Dec. 204, 206, 419 N.E.2d 71, 73 (1981).

Cases in which police direction or involvement in a private search are at issue sometimes turn on the extent of the police share in the total enterprise of securing and selecting evidence by other than sanctioned means. *United States v. Robinson,* 504 F.Supp. 425, 431 (N.D.Ga.1980); *People v. Fierro,* 236 Cal. App.2d 344, 46 Cal.Rptr. 132 (3d Dist.Ct.App. 1965); *Moody v. United States,* 163 A.2d 337 (D.C.1960).

In *Moody,* for example, a police officer responding to a radio call arrived at the scene of a fight between the defendant and the complaining witness. After the complaining witness explained that he had seen some items that had earlier been stolen from his apartment in the defendant's apartment, the officer placed the defendant under arrest and left the defendant in the custody of another officer in the patrol car. The officer then walked with the complaining witness to the defendant's apartment, where they found the door open and the stolen items scattered about the floor, plainly visible from the hallway. The complaining witness then entered the apartment, gathered up the articles, and handed them to the officer, who had remained in the hallway. Although there was no indication in the record that the officer did anything to induce the complaining witness' actions, the District of Columbia Municipal Court of Appeals concluded that the responsibility for the search and seizure must be attributed to the police authorities. The court reasoned:

> The construction to be attached to the Fourth Amendment does not permit of evasion by circuitous means. The protection thus afforded may be violated just as effectively through the intervening agency of one not a policeman. While no objection can be raised to the propriety of the arresting officer's conduct in merely viewing the articles from the adjacent hallway, we cannot characterize him as a willing but innocent beneficiary in standing silently by while the appropriation was taking place. The officer certainly recognized the evidentiary value of the goods themselves. He could not therefore escape the necessi-

ty of obtaining a search warrant when he had the reasonable alternative of posting a guard at the door until the warrant could be procured.

*Moody,* 163 A.2d at 340. The decisive factor, according to the court, was the " 'actuality of a share by a [government] official in the total enterprise of securing and selecting evidence by other than sanctioned means.' " *Id.* (quoting *Lustig v. United States,* 338 U.S. 74, 79, 69 S.Ct. 1372, 1374, 93 L.Ed. 1819 (1949)). Therefore, as long as a government official is involved in the search at any point, whether at its origin or while it was in progress, he is deemed to have participated in it so as to invoke the exclusionary rule. *Id.*

In the instant case, the motions court specifically found that the "police did not search the bedroom." Thus, there was no direct participation by the police in the search. Additionally, there is ample evidence in the record that the police were very polite and courteous in their dealings with Mrs. Kahoonei and did not specifically request or direct her to search for the weapon and ammunition.

On the other hand, we are not presented with a situation where Mrs. Kahoonei, on her own initiative and without any involvement by police, obtained the incriminating evidence and turned it over to police. There was obviously some police involvement, since at least six police officers showed up at her home in response to the report of a disturbance and gunshots. Additionally, it was while Officer Akina was interviewing Mrs. Kahoonei that she stood up, proceeded to Defendant's bedroom, and began to search for the evidence. Furthermore, Officer Akina personally stood by and observed while Mrs. Kahoonei conducted the search; thus, he clearly had knowledge of and acquiesced in the search. Officer Akina certainly recognized the evidentiary value of the items Mrs. Kahoonei was searching for.

The factual circumstances involved in this case clearly present a difficult and close question as to whether the extent of the police involvement in this case was sufficient to constitute direction of Mrs. Kahoonei to conduct the search so as to render her a government agent under the second factor of

the *Boynton* test. We therefore proceed to an examination of the third prong, the motivation factor, of the *Boynton* test in evaluating the government agency question.

### B. The Private Party's Motive in Conducting the Search

As a general rule, a private search that is conducted for a purpose other than obtaining criminal evidence does not implicate the Fourth Amendment. Thus, where a victim of a theft sees items belonging to him and conducts a search to recover the items without any knowledge of the police, no governmental search is involved. *Gunter, supra.* Also, a search by bus employees of a trunk found in the men's room of a bus terminal in order to ascertain the trunk's owner is not a governmental search. *Loyd, supra. See also* J.W. Hall, Jr., *Search and Seizure* § 12.3, at 554–55 (2d ed. 1991). Similarly, the United States Supreme Court has held that where a murder suspect's wife voluntarily turned over evidence to police in a spontaneous, good-faith effort to clear her husband of suspicion, the wife was not acting as an agent of police. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), *reh'g denied,* 404 U.S. 874 (1971). In the same vein is *United States v. Lawless,* 465 F.2d 422 (4th Cir. 1972), which found no unlawful search where the defendant's wife initiated the search for a sawed-off shotgun, apparently out of concern for her own safety, and where a police officer merely accompanied the wife as she conducted the search but never took the lead in or directed the search.

The relevant question, then, is what motivated Mrs. Kahoonei to retrieve the incriminating evidence, i.e., what was her intent or purpose?

Intent or purpose is generally a question of fact since "the determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable men might differ[.]" *Hanagami v. China Airlines, Ltd.,* 67 Haw. 357, 364, 688 P.2d 1139, 1145 (1984) (quoting *Bishop Trust Co. v. Central Union Church,* 3 Haw.App. 624, 628–29, 656 P.2d 1353, 1356 (1983)). On appeal, a trial court's findings of fact are entitled to great deference, *State v. Aplaca,* 74 Haw. 54, 65–66, 837 P.2d 1298, 1304–05 (1992), and are subject to being set aside only if they are "clearly erroneous." *Hawaii's Thousand Friends v. City & County of Honolulu,* 75 Haw. 237, 248, 858 P.2d 726, 732 (1993). A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, *State v. Miller,* No. 16677, slip op. at 16, —— Haw.App. ——, —— P.2d ——, 1995 WL 8083 (Haw. App. Jan. 9, 1995), or (2) "despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." *Hawaii's Thousand Friends, supra* at 248, 858 P.2d at 732 (quoting *Amfac Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 116, 839 P.2d 10, 27–28, reconsideration denied, 74 Haw. 650, 843 P.2d 144 (1992)).

The motions court decided, based on the totality of the evidence and its perception of the credibility of the witnesses, that when Mrs. Kahoonei entered Defendant's room to recover the handgun, "she did so as her personal agent and not on behalf of [Officer] Akina or the police department." Tr. 12/30/92, at 6. The court thus found that Mrs. Kahoonei was prompted by personal reasons to conduct the search. While such finding is entitled to great deference, we conclude, based on our review of the record, that it is clearly erroneous.

The State has admitted in this case that Mrs. Kahoonei was specifically told, before she searched Defendant's bedroom, that "a search warrant could be obtained to search the house" and a search "would be done anyway." The motions court did not consider the impact of this statement in determining the legality of the search in this case. We conclude, however, that because an affirmative explanation of the discretionary nature of the search warrant-issuing process was never provided to Mrs. Kahoonei by the police, the statement communicated to Mrs. Kahoonei the futility of refusing to cooperate with the police and was a strong motivating factor in causing her to search for the evidence. Consequently, we are left with a definite and firm conviction that the motions court was mistaken when it found that Mrs.

Kahoonei was acting for personal, rather than government, purposes when she conducted the search.

1.

While we have been unable to locate any case law in the private search context regarding the impact of similar police statements, the issue has arisen in the context of voluntary consents to searches.

In *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), the United States Supreme Court held that a search cannot lawfully be based on consent when that consent was given only after the officer conducting the search asserted that he possessed a search warrant which later turned out to be invalid. The Court reasoned:

> When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent.

*Id.* at 550, 88 S.Ct. at 1792.

In situations where a defendant consents to a search after police officers advise him that they intend to obtain a search warrant if he fails to consent, courts have generally been reluctant to hold, as a matter of law, that the police statement, by itself, vitiated the otherwise voluntary consent. *United States v. Faruolo*, 506 F.2d 490, 495 (2d Cir.1974); *United States v. Agosto*, 502 F.2d 612, 612 (9th Cir.1974); *Stephenson v. Texas*, 494 S.W.2d 900 (Tex.Cr.App.1973). In *Stephenson*, for example, the police statement was treated as "but one factor, albeit an important one, to be evaluated realistically, within the context it was uttered and in relation to all the facts surrounding the search." *Stephenson*, 494 S.W.2d at 904–05.

In that case, a police officer went to the defendant's home, met the defendant's mother, and told her that he was looking for a black suit and that her son was a suspect in a rape case. The mother was given a consent-to-search form, which she read and signed. She then went to a closet in the house, got the defendant's clothes, and gave them to the officer. In challenging the admission of the clothes into evidence, the defendant contended that his mother's consent for the search was invalid because it was coerced under color of state law. The basis of his argument was that the officer had admitted telling the defendant's mother that if she did not sign the consent-to-search form, the officer would get a search warrant to search the house.

The Texas Court of Criminal Appeals initially held that in determining whether a search is justified by the consent of a person who has a right to the possession and control of the property, a court must look "to the totality of the circumstances surrounding the questioned conduct." *Id.* at 903. Furthermore, "[a]lthough a finding of consent is not simply a finding of fact and includes also a finding of law, a conflict in testimony is best resolved by the trier of the facts who has the benefit of viewing the demeanor of the witnesses." *Id.* at 904 (citation omitted).

After examining the record in the case, the appellate court found no dispute that: the officer was polite in his behavior; only two officers entered the house, one wearing a uniform and the other dressed in plain clothes; no physical coercion was exercised; and the defendant's mother was handed and signed the consent-to-search form. The court also noted that the defendant's mother had testified that she had gone to school through the tenth grade, could read and write, and that she had not objected to the search because she did not want officers to think she had anything to hide. Furthermore, the mother had read aloud the consent-to-search form in court. Evaluating the police statement realistically within the context in which it was uttered and in relation to all the facts surrounding the search, the court found

> no indication in the record that, but for the assertion by the officer, the mother would not have consented to the search. To the contrary, the record supports the conclusion that this statement played little or no part in her decision to voluntarily retrieve the items the officers sought. [Defendant's mother] did not mention the officer's assertion in her rendition of the

facts, and when asked the question, "Would you have refused the search had you known you had the right to?" she answered, "I don't know—according to the circumstances, I really don't know what I would have done, I am just going to tell the truth, I don't know."

*Id.* at 905.

In *Faruolo, supra,* FBI agents informed the defendant that they were investigating a hijacking and asked for permission to search his house. The agents informed the defendant that he did not have to permit the search if he did not want to and that the house would not be searched without his consent. However, an agent pointed out to the defendant that if he did not consent, a search warrant would be sought. The agent further conveyed his belief that a warrant would be issued. He also stated that a warrant, because of the late hour, probably could not be obtained until the following morning and that, consequently, the FBI would have to keep his house under surveillance to prevent the removal of its contents. After thinking quietly for a minute or two, the defendant signed a consent-to-search form, which had previously been read to him and which he said he understood.

The Second Circuit Court of Appeals upheld the district court's finding that the defendant had validly consented to the search. The court noted that the defendant had been told he did not have to consent to the search. Additionally, the district court had found no evidence that the defendant or his family were physically coerced, restrained, or threatened by the agents at any time. Furthermore, the police statement was well-grounded and involved no deceit or trickery. The court of appeals concluded:

> [T]he well founded advice of a law enforcement agent that, absent a consent to search, a warrant can be obtained does not constitute coercion. There is an admission by the officer that he has no right to proceed unless the defendant consents. There was in fact, here, a fair and sensible appraisal of the realities facing the defendant.... No person, even the most innocent, will welcome with glee and enthusiasm the search of his home by law enforcement agents. However, in view of all the circumstances which we have detailed, we are persuaded that after realizing the facts, including that he had the right not to consent, [defendant] decided freely and voluntarily to consent to the search.

*Faruolo,* 506 F.2d at 495 (footnote omitted).

In a well-reasoned concurring opinion, Judge Newman indicated that while he was convinced by the facts of the case that consent had been given voluntarily, he believed that "the line surrounding permissible governmental statements about search warrants should be drawn not one whit beyond the facts of this case." *Id.* Judge Newman noted that in *Bumper v. North Carolina, supra,* the Supreme Court "recognized that despite abundant evidence of willingness to permit a search, consent sufficient to validate a warrantless search is not properly found when obtained in response to certain representations by law enforcement officers on the subject of warrants.... Moreover, as *Bumper* also indicates, trial court fact-finding concerning the underlying facts does not insulate from review the conclusion as to whether the underlying facts constitute sufficient consent to validate a warrantless search." *Id.* at 495–96.

Judge Newman pointed out that the procedures for obtaining a search warrant are designed to assure that a neutral fact-finder intervenes to determine whether probable cause has been established before a home can be searched. Therefore, what the defendant is told about the search warrant process is crucial to a determination of whether his subsequent consent to a search was voluntary:

> Were the slate clean, I would be inclined to reject a finding of voluntariness obtained in response to statements about the obtaining of a warrant that did not in some way affirmatively communicate the discretionary aspect of the warrant-issuing process. If a person is confronted with only the choice of permitting an immediate search without a warrant or waiting the brief interval necessary for a warrant to be obtained, he is misled into believing that the only variable in the choice is time, rather

than the far more important variable of whether the warrant will be issued at all. If he consents because he has been led to believe that obtaining a warrant is a virtually automatic formality, then regardless of his apparent willingness to permit the search, he has responded to a situation as "instinct with coercion" as the one in *Bumper*, where the officer gained entry not with the assurance that a warrant could be obtained, but with the statement that he had already obtained one. If the waiver on which consent to a search is premised is really to be the "intentional relinquishment ... of a known right," there ought to be some indication that the warrant-issuing process is not automatic and that resort to it affords the householder the protection that a warrant will not issue unless a magistrate has found the existence of probable cause.

*Id.* at 496–97 (citations omitted).

After discussing several other decisions in which the significance of an agent's statement concerning the likelihood of obtaining a search warrant was at issue, Judge Newman agreed, based on the facts in the case, that a finding of consent was permitted, notwithstanding an agent's having expressed his well-founded view that a warrant can be obtained. However, he emphasized two qualifications to this rule:

First, the agent should be permitted to do no more than give his prediction. Even if he need not explain the discretionary aspect of issuing warrants, he surely should not be permitted to convey the idea that no discretion exists. Any intimation that the warrant will automatically be issued should be considered as coercive as the announcement of an invalid warrant in *Bumper*. Drawing the line at this point admittedly makes validity of consent turn in some instances on subtle shifts of wording by the agent. But words spoken in the process of obtaining consent to waiver of a constitutional right ought to be chosen with care. The officers are not proceeding in haste to make a split-second decision of their authority to apprehend a fleeing suspect. They face a situation that normally calls for the delay necessary to obtain a search warrant. If they are to forego this requirement, it should not be too much to ask that they take care not to confront the accused with a choice that totally obliterates the important protective function of the warrant-issuing process. The agent can always be on the safe side of the line by plainly indicating that he will apply for a warrant and believes one will be issued, but that the decision whether to issue the warrant rests with the judge or magistrate to whom the agent will apply. Here, according to the District Court's finding, the agent stated that he would apply for a warrant and predicted its issuance. Whether the prediction was reasonable should not be determinative. That inquiry focuses on what was in the mind of the agent. But determination of consent must focus on the effect of the agent's words upon the defendant. While the words used here did little to convey the discretionary aspect of issuing warrants, they at least did not conceal it.

Secondly, trial courts considering the voluntariness of consent obtained in response to statements about procuring warrants need not rush to find consent whenever the agent's verbal formula falls within the ambit of language approved in *Bracer, Kohn*, and this case. If consent is really to be determined upon a totality of the circumstances, then the extent to which an agent minimizes the nature of the choice confronting a householder ought to weigh significantly against a finding of consent. Nearly fifty years ago Judge Learned Hand urged District Judges considering search and seizure questions to "search the testimony in such cases with care, remembering that the protection of defendants must in most cases rest finally with them."

*Id.* at 497–98 (citation omitted).

2.

In this case, Mrs. Kahoonei was advised by Sergeant Lenchanko that a warrant "could be gotten to search the house," and a search "would be done anyway." The discretionary nature of the warrant-issuing process, and the fact that the warrant had to be issued by a neutral judge, who could decline to allow its issuance, was never communicat-

ed to Mrs. Kahoonei. Instead, the officer's assertion suggested that a search warrant would automatically issue, and that Mrs. Kahoonei's house, including Defendant's bedroom, which the motions judge found that Mrs. Kahoonei had no authority to consent to a search of, would inevitably be searched. Mrs. Kahoonei was thus confronted with the choice of either helping the police obtain the incriminating evidence, or waiting around at her home, surrounded by numerous police officers and police cars, while a warrant was obtained. In view of the coercive situation Mrs. Kahoonei was placed in on the day in question, we conclude that when she searched her son's bedroom, which she had *no authority to search, she did so as an agent of the police*, thus rendering the search unlawful.

## CONCLUSION

Applying the *Boynton* test to the facts and surrounding circumstances in this case, we conclude that the motions court was wrong when it concluded that Mrs. Kahoonei was not acting as a government agent when she entered Defendant's room to recover the handgun and ammunition.

Although Mrs. Kahoonei was not actively recruited or paid to conduct the search, it is clear that the police had knowledge of and acquiesced in her search. Indeed, there was a significant police presence at her home while the search was being conducted. The police, by their own admission, could have obtained a search warrant in this case. Instead, they shortcut the process by informing Mrs. Kahoonei that they could get a search warrant and search her house, irrespective of her desires. When Mrs. Kahoonei, in response, assisted the police by searching her son's private bedroom for the incriminating evidence, she became an agent or instrument of the police, and her actions resulted in an improper warrantless search by the government. Therefore, Defendant's motion to suppress evidence should have been granted.

Accordingly, we reverse the December 30, 1992 oral order denying Defendant's November 19, 1990 Motion to Suppress the Evidence; affirm the May 20, 1993 Judgment, Guilty Conviction, and Sentence as to the harassment charge; vacate the May 20, 1993 Judgment, Guilty Conviction, and Sentence as to the two illegal firearms possession charges; and remand for a new trial.

ACOBA, Judge, concurring.

I concur in the result reached but under a different analysis.

The trial court concluded that Defendant "had a right to privacy in [the] bedroom area" from which the gun and ammunition were seized. The court further concluded, as it had to, that Mrs. Kahoonei could, therefore, "neither consent . . . to [a] search of the bedroom[ ] nor could she validly waive [D]efendant's right to privacy in the bedroom." Thus, the court determined that, "if the officers had searched the bedroom" "[t]he recovery of the gun would be illegal[.]"

According to the trial court, the issue then became whether, when "Mrs. Kahoonei entered . . . the bedroom [to recover the gun, she was] acting under the direction of or under the instruction of the police[.]" Characterizing Officer Akina's statement to Mrs. Kahoonei as an "appeal[ ] . . . to her conscience, in advising her of the risk of harm or injury that a handgun could cause," the court held that Mrs. Kahoonei had not acted as the agent of the police but "as her personal agent."

### A.

I believe the rule to apply here is clear.

The Hawai'i Supreme Court has held that "[a]n ostensibly private search is nevertheless governmental action if instigated by the authorities or if government agents participated therein." *State v. Furuyama*, 64 Haw. 109, 120, 637 P.2d 1095, 1102 (1981). "Hence, 'a search . . . physically conducted by a private individual but only at the government's initiation and under their guidelines . . . is not a private search.'" *Id.* (quoting *United States v. Haes*, 551 F.2d 767, 770 (8th Cir. 1977)). Accordingly, where the police instigate or initiate the search or participate in or guide it, the search constitutes government action subject to all constitutional limitations.

The facts here fit the test set out in *Furu-yama* and I believe that test to be controlling.

It is abundantly plain that Mrs. Kahoonei did not arrive at an independent decision to recover the gun. Defendant had been arrested and removed from the premises. The police, nevertheless remained on the premises, obviously to further their investigation and to recover evidence against Defendant. The thought of searching for a gun did not originate with Mrs. Kahoonei but with the police. Sergeant Lenchanko indicated to the two women that "a search warrant could be obtained" and so a "search would be done anyway." The only conceivable conclusion that can be drawn from this is that the police were intent upon a search of the premises. After this advisory, the women were separated and each interrogated by a police officer. In this investigatory setting, Officer Akina made his appeal to, as the trial court characterized it, Mrs. Kahoonei's "conscience." But, however the court might have characterized the statement, it was the officer's thought that was communicated by him to Mrs. Kahoonei. The objective of his entreatment—that of recovering the gun and having it turned over to the police—was clear and, thus, like Sergeant Lenchanko's declaration, subject under *Furuyama* to constitutional scrutiny. Indeed, even if the statement were, as the court characterized it, an "appeal[ ] ... to ... reason and ... conscience[,]" it was no less an urging or instigation of a third party to conduct a search of the premises that the officers knew they could not conduct without a warrant, as Sergeant Lenchanko's statement indicated.

Within this factual context and with all due respect to the majority, I see no relevance to an analysis of Mrs. Kahoonei's motivation. It is at best a speculative venture which may leave the mistaken impression that under these or similar facts a private person's implied motivation may somehow vitiate the precipitating conduct of the police.

## B.

I agree with the majority that *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), is instructive, but primarily for the effect to be given warrant representations by officers. In *Bumper*, the prosecution relied on the consent of Defendant's grandmother to justify a search of the premises although the sheriff claimed to have had a search warrant when conducting the search. No search warrant, however, was ever produced and the United States Supreme Court held that the State had "the burden of proving that the [grandmother's] consent was, in fact, freely and voluntarily given," and that "[t]his burden cannot be discharged by showing no more than mere acquiescence to a claim of lawful activity." *Id.* at 548–49, 88 S.Ct. at 1792. The court explained that, "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search[,] [and] [t]he situation is instinct with coercion.... [Thus,] [w]here there is coercion there cannot be consent." *Id.* at 550, 88 S.Ct. at 1792.

There is very little practical distinction, from the point of view of its effect on a lay person, between an officer's claim that he or she has a search warrant and the statement that "a search would be done anyway." By indicating that "a search would be done anyway," the police, here, clearly made a "claim of lawful activity." The officer's statement in the instant case, as in *Bumper*, was substantially "instinct with coercion." *Id.* at 550, 88 S.Ct. at 1792. Being coercive, a search made by a private party after such a statement could not be anything other than a search initiated or instigated by the police.

I can find no valid constitutional principle or law enforcement objective which sanctions the practice of obtaining a third party's assistance in conducting a search based on the police's representation that "a search warrant could be obtained" and so a search "would be done anyway." It is obvious the purpose of the police statements was to convince the two women to retrieve the gun for the police without the aid of a warrant, thus absolving the police of any possible illegality in the recovery of the gun. This was followed, in turn, by Mrs. Kahoonei's retrieval of the gun from a place she herself had no legal right to be. A police practice of obtain-

ing the aid of a third party to conduct what may potentially be a civilly and criminally wrongful private search on the representation that "a search would be done anyway" should not be sanctioned in our courts. Our jurisdiction has rejected evidence obtained as a result of coercion even when such coercion did not involve government action, in recognition of the principle that our courts should not serve as accomplices to illegal acts. *Cf. State v. Bowe,* 77 Hawai'i 51, 881 P.2d 538 (1994).

As a result, I do not agree with Judge Newman's suggestion, cited in our opinion, that such warrant representations can be sanitized if the officer "in some way communicates the discretionary aspect of the warrant-issuing process." *United States v. Faruolo,* 506 F.2d 490, 496 (2d Cir.1974). In cases involving "private" searches, it is doubtful that such information, when conveyed to a third person sought to be enlisted in a police search effort, can have any realistic effect on protecting the privacy rights of another.